Michael D. **GARY** (No. 83–796), Sylvester Cole (No. 84–703), and Leroy Pee (No. 84–997), Appellants,

v.

**UNITED STATES,** Appellee.

Nos. 83–796, 84–703 and 84–997.

District of Columbia Court of Appeals.

Argued ab initio En Banc Oct. 22, 1984.

Decided Oct. 17, 1985.

---

Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Harold H. Koh, Atty., U.S. Dept. of Justice, and Robert K. Reed, Asst. U.S. Atty., Washington, D.C., were on brief in No. 84–997.

John H. Suda, Principal Deputy Corp. Counsel, Washington, D.C., with whom Inez Smith Reid, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on briefs for Intervenor District of Columbia.

Cynthia A. Giordano, Jacquelyn V. Helm, James C. McKay, Jr., and Phyllis D. Thompson, Washington, D.C., were on brief for amicus curiae, Division VI (District of Columbia Affairs), District of Columbia Bar.

Daniel J. Popeo, Paul D. Kamenar, Robert Dowlut, and Richard E. Gardiner, Washington, D.C., were on brief for amicus curiae Washington Legal Foundation.

J. Philip Kessel, Washington, D.C., for appellant in No. 83–796. James Klein, Washington, D.C., with whom Mark S. Carlin, Randy Hertz, Blair G. Brown, and John P. Dwyer, Washington, D.C., were on brief for appellant in No. 84–703. Lawrence M. Baskir, Washington, D.C., for appellant in No. 84–997.

Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Harold H. Koh, Atty., U.S. Dept. of Justice, Mark J. Biros, Susan R. Holmes, Mary Ellen Abrecht, and Bradley L. Kelly, Asst. U.S. Attys., Washington D.C., were on brief for appellee in Nos. 83–796 and 84–703.

Before PRYOR, Chief Judge, NEBEKER, MACK, NEWMAN, FERREN, BELSON, TERRY and ROGERS, Associate Judges.

Opinion for the court by Associate Judge NEWMAN.

Concurring opinion by Associate Judge NEBEKER at p. 836.

Opinion concurring in part and dissenting in part by Associate Judge MACK at p. 849.

Concurring statement by Associate Judge BELSON at p. 859.

Concurring opinion by Associate Judge TERRY at p. 859.

NEWMAN, Associate Judge:

The principal issue presented for decision in these cases is the impact of *Immigration & Naturalization Service v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), on the one "House of Congress" veto provision of the D.C. Self-Government and Governmental Reorganization Act, D.C.Code §§ 1–201 to –295 (1981) ("Home Rule Act") and the consequences upon the convictions on appeal in these cases. We hold that the one house veto provision contained in § 233(c)(2) of the Home Rule Act is invalid based on *Immigration & Naturalization Service v. Chadha, supra,* that this provision is severable, and that our decision shall apply prospectively only.

Gary challenges his conviction for rape (D.C.Code § 22–2801 (1981)), and Cole his conviction for carnal knowledge (D.C.Code § 22–2801 (1981)). They contend that the Code provisions, under which they were convicted, had been repealed by the adoption of the District of Columbia Sexual Reform Act of 1981, D.C.Act. No. 4–69, 28 D.C.Reg. 3409 (1981) (S.A.R.A. of 1981), since the "veto" of that Act by the House of Representatives was a nullity. They both agree with the position of the United States that the one house veto provision is severable. Gary contends he is entitled to a new trial for this and other reasons while Cole argues that he is entitled to be resentenced for this and other reasons. Pee was convicted of possession of heroin with intent to distribute (D.C.Code § 33–541(a)(1) (Supp.1984)). He contends that the one house veto provision is invalid, unseverable, and that without the one house veto, the Home Rule Act would not have been passed by Congress. He thus contends the government of the District of Columbia was without authority to enact the statute he was convicted of violating. (District of Columbia Uniform Controlled Substance Act of 1981, D.C.Code §§ 33–501 to –567 (Supp.1984)). We hold that none of the appellants is entitled to relief.

## I

### *History*

Self-government existed within what were to become the boundaries of the District of Columbia when Maryland in 1778 and Virginia in 1779 ceded territory to the United States to enable the location of the nations capital on the river Potomac, at some place between the mouths of the east-

ern branch and Connogocheque.[1] In 1801, Congress passed the Organic Act,[2] which formed the city into two counties, Washington and Alexandria, and provided for presidentially appointed judicial officers. The Act of May 3, 1802,[3] incorporated the city of Washington and created a mayor-council system of government. The bicameral council was popularly elected and the mayor was presidentially appointed. In 1812, the composition of the council was revised (although it remained bicameral), and the mayor was to be elected by both chambers of the council. The Act of May 15, 1820 [4] provided for a popularly elected mayor and bicameral council.

In 1871, the first step backwards from local self-government was taken. Congress, by the Act of February 21, 1871,[5] unified the entities of Georgetown, the City of Washington and the County of Washington to create a "municipal corporation." A governor was appointed by the president but only one chamber of the bicameral legislature was popularly elected. Beginning in 1874 [6] and culminating in 1878,[7] the right of citizens of the District of Columbia to participate in the election of those who would govern them was abolished. The government became three presidentially-appointed Commissioners, one of whom was to be a member of the Corps of Engineers of the U.S. Army. Thus, the situation remained until 1967.

In 1967, using his authority of executive reorganization, the President established a mayor-council government. The mayor and the council were presidentially appointed, subject to Senate confirmation. This form of government continued until the enactment of the Home Rule Act which is at issue in these cases.[8]

## II
### Legislative Vetoes in the Home Rule Act

The Home Rule Act contains two separate legislative veto provisions—that contained in § 233(c)(1) and that contained in § 233(c)(2). Section 233(c)(1) provides for veto of certain acts of the District of Columbia government (including certain voter approved initiatives and referendums) by Congress adopting "a concurrent resolution disapproving such act." Section 233(c)(2) provides:

> In the case of any such act transmitted by the Chairman with respect to any act codified in Title 22, 23, or 24, such act shall [become effective after a certain time] ... only if ... 1 House of Congress does not adopt a resolution disapproving such act.

It is with respect to the "1 House of Congress" veto provision that we must be concerned.

## III
### Immigration & Naturalization Service v. Chadha

The issue presented in Chadha as stated in the opinion of the Court was

1. Act of July 16, 1790, ch. 28, 1 Stat. 130, as amended, Act of March 3, 1791, ch. 17, 1 Stat. 214.

2. Act of Feb. 27, 1801, ch. 15, 2 Stat. 103.

3. Act of May 3, 1802, ch. 53, 2 Stat. 195.

4. Act of May 15, 1820, ch. 104, 3 Stat. 583.

5. Act of Feb. 21, 1871, ch. 62, 16 Stat. 419.

6. Act of June 20, 1874, ch. 337, 18 Stat. 116.

7. Act of June 11, 1878, ch. 180, 20 Stat. 102.

8. The Home Rule Act provides for an elected mayor and an elected unicameral council.

For a more detailed analysis of the history of the governance of the District of Columbia, see Home Rule for the District of Columbia 1973–1974, Background and Legislative History of H.R. 9056, H.R. 9682 and Related Bills Culminating in the District of Columbia Self-Government and Governmental Reorganization Act (Comm.Print 1974) (House Committee on the District of Columbia 1974) [hereinafter cited as Legislative History]. Newman and Depuy, Bringing Democracy to the Nation's Last Colony: The District of Columbia Self-Government Act, 24 Am.U. L.Rev. 537, 542 (1975). The foregoing historical summary generally tracks that contained in the latter publication. See also C. Green, Washington: A History of the Capital 1800–1950 (1962).

the constitutionality of the provision in § 244(c)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1254(c)(2), authorizing one House of Congress, by resolution to invalidate the decision of the Executive Branch, pursuant to authority delegated by Congress to the Attorney General of the United States, to allow a particular deportable alien to remain in the United States.

*Chadha, supra,* 462 U.S. at 923, 103 S.Ct. at 2770.

The Supreme Court found the one-house veto provision to be unconstitutional because it violated the bicameralism and presentment requirements of art. I of the Constitution which provide:

All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives. [Art. I, § 1.]

Every Bill which shall have passed the House of Representatives and the Senate, shall before it become a Law, be presented to the President of the United States; ... [Art. I, § 7, cl. 2.]

Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations, prescribed in the Case of a Bill. [Art. I, § 7, cl. 3.]

The Court held that all legislative acts by Congress must be presented to the President after bicameral passage before becoming law. "The President's role in the lawmaking process also reflects the Framer's careful efforts to check whatever propensi-

ty a particular Congress might have to enact oppressive, improvident, or ill-considered measures." *Chadha, supra,* 462 U.S. at 947–48, 103 S.Ct. at 2782–83. The Court pointed out that the bicameral requirement was of no less importance and it would help insure that legislative measures had been carefully considered. *Id.* 462 U.S. at 948–49, 103 S.Ct. at 2783.

The *Chadha* holding is broad and sweeping and it undoubtedly invalidates most, if not all, legislative veto provisions enacted by Congress. *See Chadha, supra,* 462 U.S. at 959, 103 S.Ct. at 2788. (Powell, J., concurring), and, *id.* at 967, 103 S.Ct. at 2792 (White, J., dissenting). It is its impact on the Home Rule Act to which we now turn.

### IV

*Applicability of Chadha to the Home Rule Act*

Admittedly every action taken by Congress is not legislative. The determining factor is not the form of the action but whether it is legislative in character. *Chadha, supra,* 462 U.S. at 952, 103 S.Ct. at 2784. On the issue presented in *Chadha,* the Court found the use of the one house veto to be essentially legislative in purpose and effect. This legislative character was demonstrated in *Chadha* by the fact that Congress could not have required the Attorney General to deport Chadha, absent the legislative veto provisions, unless it passed separate legislation requiring deportation. *Id.* at 952–53,[9] 103 S.Ct. at 2784–85.

■ Likewise, the powers involved in the Home Rule Act veto provision are legislative in character, effect and fact. Absent the veto provision, once the Council of the District of Columbia and the Mayor have properly exercised their delegated powers to promulgate new sections of the District of Columbia Code, Congress could not have

9. The Supreme Court also took note that the veto was legislative because it affected the rights and duties of people outside the legislative branch. *Chadha, supra,* 462 U.S. at 952, 103 S.Ct. at 2784. We believe that a fair reading of this means the rights and duties of people outside the national legislative branch, *i.e.,* Congress itself.

overridden these new sections of the Code without passing legislation (which was presented to the President) for that purpose. Thus the one house veto in the Home Rule act is the same for all relevant purposes as the one house veto in *Chadha.* It is just as constitutionally defective for not meeting the requirements of Art. I.

It has been suggested that when Congress legislates for the District of Columbia it need not meet the Art. I requirements due to the special relationship of Congress to the District of Columbia and its plenary power over it.[10]

It is true that "the powers granted [to Congress over the District] are obviously different in kind from the other broad powers conferred to Congress: Congress' power over the District of Columbia encompasses the *full* authority of government, and thus, necessarily, the Executive and Judicial powers as well as the Legislative." *Northern Pipeline Construction Co. v. Marathon Pipeline Co.,* 458 U.S. 50, 76, 102 S.Ct. 2858, 2874, 73 L.Ed.2d 598 (1982). This statement does no more than point out that with regard to the District of Columbia, Congress sits with full authority akin to a state legislature. "Congress 'may exercise within the District all legislative powers that the legislature of a State might exercise within the State, . . . so long as it does not contravene any provision of the Constitution of the United States.' " *Palmore v. United States,* 411 U.S. 389, 397, 93 S.Ct. 1670, 1676, 36 L.Ed.2d 342 (1973) (citation omitted). However, Congress' position as a "state legislature" does not exempt it from following the "single, finely wrought and exhaustively considered, procedure" as required in Art. I. *Chadha, supra,* 462 U.S. at 951, 103 S.Ct. at 2784.

State legislatures are not required to meet the requirements of Art. I of the Constitution of the United States. How-

ever, just as the state legislatures must follow the procedures of bicameralism and presentment when required by the state constitution,[11] Congress, which is governed by the United States Constitution, must follow the demands of Art. I. It is also not persuasive that Congress was delegated "exclusive" power to legislate for the District of Columbia in Art. I, § 8 cl. 17. "[I]t is clear from the history of the provision that the word 'exclusive' was employed to eliminate any possibility that the legislative power of Congress over the District was to be concurrent with that of the ceding states." *District of Columbia v. Thompson Co.,* 346 U.S. 100, 109, 73 S.Ct. 1007, 1012, 97 L.Ed. 1480 (1953).

The plenary power of Congress over the District of Columbia is incapable of saving the veto provision. The Supreme Court has said that " 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell,* 430 U.S. 787, 792, (1977). Yet, in *Chadha,* the Court found that this plenary power could not overcome the need for Congress to follow bicameral and presentment procedures of Art. I procedures when exercising plenary power through legislation. The role of the President in the legislative process was discussed in *Chadha.*

> It establishes a salutary check upon the legislative body; calculated to guard the community against the effects of faction, precipitancy, or of any impulse unfriendly to the public good which may happen to influence a majority of that body. . . . The primary inducement to conferring the power in question upon the Executive is to enable him to defend himself; the secondary one is to increase the chances in favor of the community against the passing of bad laws through haste, inadvertence, or design. The Federalist No. 73 [ ] at 458 [H. Lodge ed. 1888] (A. Hamilton).

**10.** *See, e.g., United States v. Langley,* 112 Wash. D.L.Rptr. 801 (April 23, 1984); *United States v. McIntosh,* 112 Wash.D.L.Rptr. 789 (April 20, 1984); Brief of Intervenor, District of Columbia.

**11.** *See State v. A.L.I.V.E. Voluntary,* 606 P.2d 769 (Alas.1980); Opinion of the Justices, 121 N.H. 552, 431 A.2d 783 (1981); *State ex rel. Barker v. Manchin,* 279 S.E.2d 622 (W.Va.1981).

*Chadha, supra,* 462 U.S. at 948, 103 S.Ct. at 2783. This provision has particular relevance to the District of Columbia whose citizens have no voting representation in either House of Congress.

There are only four provisions in the Constitution which allow one House of Congress to act with force of law not subject to the bicameral and presentment requirements of Art. I: (a) the House of Representatives alone was given the power to initiate impeachments. Art. I, § 2, cl. 2, (b) the Senate alone was given power to conduct trials following impeachment on charges initiated by the House and to convict following trial. Art. I, § 3, cl. 5; (c) the Senate alone was given final reviewable power to approve or to disapprove presidential appointments. Art. II, § 2, cl. 2; and (d) the Senate alone was given unreviewable power to ratify treaties negotiated by the President. Art. II, § 2, cl. 2.

"Clearly when the Draftsmen sought to confer special powers on the House, independent of the other House, or of the President, they did so in explicit, unambiguous terms." *Chadha, supra,* 462 U.S. at 955, 103 S.Ct. at 2786. (footnote omitted). The action taken by Congress in exercising the one house veto provision is not authorized by any of these exceptions. We find the one house of Congress legislative veto provision in the Home Rule Act unconstitutional.[12]

### V

#### *Severability*

Having held the one-house veto in the Home Rule Act unconstitutional, we must next determine whether the unconstitutional provision can be severed from the remainder of the Home Rule Act or whether the unconstitutional provision is unseverable and thus the Home Rule Act or portions thereof must fall.

■ In *Chadha,* the Court reaffirmed the doctrine enunciated in *Buckley v. Valeo,* 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976), and *Champlin Refining Co. v. Corporation Comm'n,* 286 U.S. 210, 234, 52 S.Ct. 559, 567, 76 L.Ed. 1062 (1932), that invalid provisions are to be severed unless it is "evident" that without those provisions, the legislature would not have enacted the remaining provisions. *Chadha, supra,* 462 U.S. at 931–32, 103 S.Ct. at 2774. While the Court recognized that such an inquiry is sometimes an elusive one, it recognized a presumption of severability where the remaining provisions, standing alone, are "fully operative as a law." *Id.* at 934, 103 S.Ct. at 2775 (quoting *Champlin Refining Co. v. Corporation Comm'n, supra,* 286 U.S. at 234, 52 S.Ct. at 564). As the Court has stated in this context, the "cardinal principal of statutory construction is to save and not to destroy." *Tilton v. Richardson,* 403 U.S. 672, 684, 91 S.Ct. 2091, 2098, 29 L.Ed.2d 790 (1971) (plurality opinion), quoting *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 30, 57 S.Ct. 615, 621, 81 L.Ed. 893 (1937). As applied to these cases, the issue is whether absent the one house veto, Congress would have refused to pass the Home Rule Act.[13]

The Home Rule Act does not contain a severability clause. However, as the Su-

---

12. The use of the veto cannot be sanctioned by construing it as an amendment or repeal of the powers delegated in the Home Rule Act. "Amendment and repeal of statutes, no less than enactment, must conform with Art. I." *Chadha, supra,* 462 U.S. at 954, 103 S.Ct. at 2786 (footnote omitted). Congress has delegated these legislative powers to the Council of the District of Columbia and must abide by that delegation until it is legislatively altered or revoked. *Id.* at 955, 103 S.Ct. at 2786.

13. In its Memorandum Opinion and Order in the *Cole* case, the trial court held that the one-house veto was unseverable but fatally infected only the authority of the District of Columbia government to enact criminal laws. We reject this analysis. The Home Rule Act does not grant separate authority to the Council of the District of Columbia with respect to criminal laws as distinguished from other laws. Rather, the Act generally authorizes the District of Columbia to enact legislation. D.C.Code §§ 1–204, –227 (1981).

preme Court has held, "the ultimate determination of severability will rarely turn on the presence or absence" of such a clause. *United States v. Jackson,* 390 U.S. 570, 585 n. 27, 88 S.Ct. 1209, 1218 n. 27, 20 L.Ed.2d 138 (1968). Rather, the issue remains one of "legislative intent, but the presumption is in favor of severability." *Regan v. Time, Inc.,* — U.S. —, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984).

When we examine the purposes of the Home Rule Act, we have no doubt that the Act, minus the one-house veto, remains fully operative as a law. Congress stated as among its primary purposes its intention: (1) to "grant to the inhabitants of the District of Columbia powers of local self-government;" and (2) "to the greatest extent possible, consistent with the constitutional mandate, relieve Congress of the burden of legislating upon essentially local District matters." D.C.Code § 1-201 (1981). *See McIntosh v. Washington,* 395 A.2d 744, 753 (D.C.1978). These purposes continue to be served absent the veto provision. The invalidity of the one-house veto does not remove congressional oversight. The ultimate authority to legislate for the District of Columbia is vested in the Congress by art. I, § 8, cl. 17 of the Constitution. The fact of this ultimate authority is reflected in D.C.Code §§ 1-201(a), 206 (1981). D.C.Code §§ 1-233(c)(1) and (c)(2) provide for a legislative day layover of 30 days in Congress of any enactment by the local government in order to permit Congress to exercise its ultimate authority. And as appellant Cole says:

> Moreover, the Act contains numerous controls over self-government that would remain fully intact and operative after severance of the offending clause containing the one-house veto provision: ultimate authority over the District's budget; substantive limitations on the council's legislative authority; federal auditing of the District's accounts and operations; federal authority over the composition, structure, and jurisdiction of the local judicial system; Presidential appointment of local judges with the advice and consent of the Senate; federal planning agency review of local planning decisions; protection of a federal enclave of core buildings, monuments and grounds, excepted from the Act; Presidential control over the police in emergency situations; Congressional review of Charter amendments.

Brief for Appellant Cole at 40 n. 16 (citations omitted).

We next turn to the legislative history. Given the presumption in favor of severability, the burden is upon the party urging unseverability to establish that the veto provision "was so essential to the legislative purpose that the statute would not have been enacted without it." *Consumers Energy Council of America v. FERC,* 218 U.S.App.D.C. 34, 54 n. 70, 673 F.2d 425, 445 n. 70 (1982), *summarily aff'd sub nom. Process Gas Consumers Group v. Consumer Energy Council of America,* 463 U.S. 1216, 103 S.Ct. 3556, 77 L.Ed. 1402 (1983).[14] Put another way, a party urging unseverability must establish that excision of the one-house veto would contradict the intent and purpose of Congress. The mere presence of debate, albeit extended and sometimes heated, cannot provide the evidence to direct a finding of unseverability. *See Gulf Oil Corp. v. Dyke,* 734 F.2d 797, 804 (Temp.Emer.Ct.App.1984); *EEOC v. Hernando Bank, Inc.,* 724 F.2d 1188, 1190-91 (5th Cir.1984). The District of Columbia contends:

> The presumption in favor of severability applies with particular force to an invalid congressional veto provision. Such a provision, is by definition, only a procedural means to forward a substantive goal. See Note, *Severability of Legislative Veto Provision, A Policy Analysis* 97 Harv.L.Rev. 1182, 1196 (1984). ("The legislative veto is a procedural de-

---

**14.** The summary affirmance by the Supreme Court was in face of a dissent by Justice White in which he found the one-house veto provision of the Natural Gas Policy Act of 1978 to have been "central" to the passage of the Act. *Process Gas, supra,* 463 U.S. at 1217, 103 S.Ct. at 3557.

vice that cannot stand by itself: it must always be attached to some substantive legislation.... [T]he veto provision is merely an appendage to a substantive law...."). As such, it is presumptively subsidiary to the substantive ends it was intended to foster. Therefore, it has been argued,

> the courts should sever veto provisions when doing so frustrates only the subsidiary policy of congressional control. If Congress decides that the statute should not survive without its veto provision, Congress is free to repeal the statute.

*Id.*

The same point is clear from *Chadha* itself. For, the Court specifically stated that an unconstitutional provision is "presumed severable if what remains is 'fully operable as a law'", 462 U.S. at 934, 103 S.Ct. at 2775, quoting *Champlin Refining Co. v. Corporation Commission, supra;* 286 U.S. at 234, 52 S.Ct. at 564. The Court, in deciding to sever the veto provision, concluded that the statute was "fully operative" because "Congress' oversight of the exercise of this delegation is preserved since all such [exercise] * * * will continue to be reported to it" and, therefore, the statute "survives as a workable administrative mechanism without the one-House veto." *Id.* 462 U.S. at 934-35, 103 S.Ct. at 2775-76. [sic]

Brief of Intervenor, District of Columbia at 25.

Appellant Pee basically advances three arguments in favor of unseverability: (1) differential methods of Congressional oversight contained in the Home Rule Act; (2) the absence of a severability clause and the significance thereof; and (3) legislative history showing the special concerns of Congress with the criminal law of the District of Columbia.[15]

Pee points out that the Home Rule Act itself contains three different methods of. congressional oversight. D.C.Code § 1-

205 (1981) provides that amendments to the Charter of the District of Columbia become effective after passage by the Council, approval by the voters in a referendum, and approval by a concurrent resolution of Congress. Acts not involving amendments to the criminal law, says Pee, are subject to a two-house veto. D.C.Code § 1-233(c)(1) (Supp.1984). In contrast, Pee contends that amendments to the "criminal law" of the District of Columbia are subject to one-house veto pursuant to D.C.Code § 1-233(c)(2) (1981). Pee notes: "No clearer connection on the special limitation of this particular power" (amending the criminal law) "could possibly exist in any statute than the explicit cross-referral of the power to the veto as appears in this section." Brief for appellant Pee at 21.

Pee's second argument is centered on the absence of a severability clause in the Act. He points out that the bill passed by the Senate, S. 1435, contained a one house veto over all legislation passed by the Council (except for matters previously within the power of the prior Commissioner form of government to enact); and a severability clause. The House bill which passed, H. 9682, contained no veto provision, no severability clause and no grant of authority to the Council in the area of criminal law. Pee further points out that the bill reported out by the Conference Committee and as ultimately enacted contained authorization for the local government to enact criminal laws, contained a one-house veto over such criminal laws, and had no severability clause. He contends that this indicates a compromise between the Senate and House conferees that granted to the local government power to enact criminal laws only if they were subject to a one-house veto and that the absence of a severability clause was intentional to insure that if the one-house veto was invalid, then the grant of criminal law authority was also invalid.

Pee contends that the legislative history of the act buttresses his contentions. He

---

**15.** Amicus, Washington Legal Foundation, joins

in part of these contentions.

first traces the evolution and passage of the Senate bill. He points to the Senate Report which says that "the 'bill further insures Congressional supervision of the District' by authorizing a legislative veto. '[T]his type of veto of Council action will insure to the Congress the continued ultimate control of the affairs of the District.'" Legislative History, *supra*, at 2726. He further points to floor debate by opponents of granting criminal law authority to the local government. Specifically he cites several attempts to amend the bill by Senators. Senator William Scott of Virginia referred to the preconstitutional riots that he contended led to the constitutional provision vesting exclusive legislative control of the District of Columbia in the Congress. U.S. Const. art. I, § 8, cl. 17. Constitution of the United States. An amendment offered by Senator Scott to transfer control of the District of Columbia prison at Lorton, Virginia, to federal control was defeated. Senator Norris Cotton of New Hampshire, a supporter of home rule, proposed an amendment to authorize the President to appoint the District of Columbia Chief of Police. Senator Cotton was of the view that this was necessary to insure the safety of members of Congress and the other branches of federal government. This amendment was defeated.

Pee next turns to the legislative history of the House bill. The Committee on the District of Columbia reported H.R. 9682 to the floor. This bill granted broad legislative authority and contained a veto only as to Charter amendments. The minority report by seven committee members stresses public safety concerns as well as concerns that the bill was constitutionally infirm since it made no provisions for a presidential veto. After three days of hearings before the Committee on Rules, the Committee on the District of Columbia prepared a substitute bill. It differed from the prior bill in what Pee contends are seven points relevant to the issues before us: (1) presidential authority over the police in an emergency; (2) a presidential veto was included; (3) Senate confirmation of local judges; (4) no authority over U.S. Attorney and U.S. Marshal's offices; (5) provision for automatic retention of qualified judges; (6) requirement of a 30-day layover period for congressional review of all enactments by the local government; and (7) prohibition against changes to the criminal code by the local government.

The floor debate in the House, says Pee, centered around two general areas pertinent to these cases: (1) public safety (including crime, police and the judiciary); and (2) federal oversight (including presidential and legislative vetoes as well as general congressional review). A number of members of the House expressed concerns about public safety and federal oversight, among them being the then Minority Leader Rep. Gerald Ford of Michigan, Rep. Ancher Nelsen of Minnesota and Rep. Joel Broyhill of Virginia. A series of amendments were proposed. One, which was adopted, restored to the President authority to nominate judges to the local courts (the Committee bill placed the appointing authority in the Mayor). Rep. Broyhill of Virginia proposed a general one-house veto and a presidential veto. This amendment was supported by Rep. Ancher Nelsen, ranking minority member on the Committee on the District of Columbia, but it was defeated. Also defeated was the substitute bill sponsored by Rep. Nelsen and Rep. Edith Green of Oregon which, according to Pee, was based on the Nelsen Commission's recommendations. The Nelsen-Green substitute granted narrow powers to the local government and provided for both a presidential and one-house veto. The House thereafter passed the Committee on the District of Columbia's Substitute Bill with certain amendments. Conferees were appointed by the House and Senate and the Conference Committee met over a five-day period. The bill reported back by the Conference Committee contained legislative authority in the local government to enact criminal laws but only after a two-year wait for the report of the District of Columbia Law Review Commission to be sub-

mitted to Congress. The Conference Committee bill also contained a one-house provision as to criminal law and a two-house veto as to all other enactments. This bill also made it simpler procedurally to obtain a floor vote on a one-house veto than was procedurally provided for with the two-house veto.

The Conference Committee Report was terse or in the words of Pee "laconic." It restated the two bills referred to it and set forth the compromises. No explanation was given for any of the specific compromises. During floor debate in the Senate on the Conference Committee Report, Senator Thomas Eagleton, Chairman of the Senate Committee on the District of Columbia, called attention to the differential methods of congressional oversight contained in the bill. Rep. Charles E. Diggs, Jr. of Michigan, Chairman of the House Committee on the District of Columbia, made similar remarks in the House. Pee particularly points to the following remarks by Rep. Diggs:

> In the give and take of this conference report also, Mr. Speaker, we note that some of the strongest feelings on the part of some of us have been set aside. For example, *on congressional veto, the Senate was very strong on that and as a matter of fact I think I learned for the first time the real reason the Senate has been able to pass home rule in the past so expeditiously* is because it was just felt in the other body that as long as there is a veto apparatus, as long as there is a congressional process to correct what they might consider to be a misaction on the part of a local legislative body, then they were inclined to be generous about it. So the veto was retained in the bill despite some misgivings about it from the self-determination pursuits among us in this body and beyond.

Legislative History, *supra* at 3050 (emphasis added). Pee asserts:

Chairman Diggs' trenchant observation is notable for two reasons. First, it alone is sufficient to satisfy the Supreme Court's "What if" test. There can be no better judge of the importance of the veto to successful home rule than that of the new D.C. Committee Chairman. Leaving the first conference committee on home rule in modern times, he had finally discovered why the Senate had been able to pass bills repeatedly while the House had always been stymied. The secret? Legislative veto.

Brief for appellant Pee at 43.

With the exception of Pee, all the other parties (the United States, Gary and Cole) as well as *amici*, the District of Columbia and Division IV of the District of Columbia Bar, urge that the legislative veto provision is severable. Among them, they advance a number of arguments, most of which we proceed now to summarize.

In the 24 years prior to the 93d Congress, the Senate had passed seven home rule bills. Most of these bills did not contain a one-house veto.[16] Thus, the Senate history does not show that it considered a legislative veto to be an essential element of a Home Rule Act.

Those urging severability next point us to the legislative history during the 93d Congress. The legislative history of the Home Rule Act as enacted shows that in the over 4,000 pages, there was little discussion of the legislative veto. Since the Senate passed its bill before the House did, we turn first to the legislative history of the Senate bill.

The Senate Report on its bill, S.Rep. 93–219, which points to the one-house veto provision as a means of insuring the ultimate authority of Congress with respect to the District of Columbia, placed no particular emphasis on this provision. Legislative History, *supra*, at 2726. During floor debate in the Senate, only one Senator made reference to the legislative veto. In sum-

---

**16.** *See* Legislative History, *supra*, at 1507–21; *see also* R. Ehlke, "The Legislative Veto Provision of the District of Columbia Home Rule Act in the Wake of *I.N.S. v. Chadha*" at 10 (July 5, 1983) (report prepared by the Congressional Research Service of the Library of Congress).

marizing the provisions of the bill, Senator Eagleton listed the one-house veto as a mechanism of insuring congressional oversight. Legislative History, *supra*, at 2754, 2756–57. However, he emphasized the central purposes of the bill as being (1) to relieve Congress of the burden of legislating for the District of Columbia, and (2) to restore self-government to the residents of the District. As he said:

> Mr. President, more is at stake than the local matters previously recited, because, as is reflected in S.1435, the very essence of local government will be mandated and legislated by this bill, once enacted into law, so that an elected mayor and an elected city council can make the vital decisions that affect the destinies of three-quarters of a million American citizens.

Legislative History, *supra*, at 2755.

Senator Charles Mathias, the ranking minority member of the Senate Committee on the District of Columbia, spoke in a similar vein. After reciting the history of home rule in the District of Columbia since its inception, he said:

> The passage of this bill would restore local self-government to the Capital and would return to the citizens of the District of Columbia, after far too long a time, the basic democratic privileges which the citizens of every village, every town, every city, every county, every State now enjoy.
>
> Let me emphasize the word "return," because home rule is nothing novel for the District of Columbia. There was a Mayor of Washington, elected by the people. There was a City Council, elected by the people. In fact, in the very earliest days, there was more than one, because each of the various small communities that had existed prior to the establishment of the District of Columbia had its own elected municipal officials.
>
> So we would merely be reestablishing the grassroots democracy which existed when the Federal Government acquired

the immediate authority for the government of this area.

Legislative History, *supra*, at 2758.

We now turn to the proceedings in the House on H.R. 9682. As reported out by Committee, the Council was given jurisdiction over criminal laws, *inter alia*, and there was no provision for legislative veto of laws passed by the Council. Legislative History at 1243, 1351, 1476. However, § 303(b) of H.R. 9682 did provide for a one-house veto of amendments to the Charter. In the dissenting report, signed by seven members of the Committee, those who opposed H.R. 9682 asserted that giving a one-house veto over Charter Amendments unconstitutionally deprived the President of his veto power guaranteed by the presentment clause of art. I of the Constitution. These members foreshadowed the constitutional issue decided by the Supreme Court in *Chadha*. Thus, says Cole, "[i]t is hard to imagine that any member of the House viewed a dubiously constitutional provision as the *sine qua non* of the Act". Brief for appellant Cole at 42. The proponents of severability also emphasized the lack of reference to the legislative veto in the three days of Hearings before the Committee on Rules, Legislative History, *supra*, at 1745–1842, and the subsequent defeat on the floor of the House of the Broyhill and Green-Nelsen substitutes, both of which contained one-house veto provisions.

As previously noted, *see supra*, at 18, the Committee on the District of Columbia introduced a substitute which, among other changes, deleted the delegation of authority to modify certain statutes pertaining to criminal law. Rep. Brock Adams of Washington, Chairman of the Subcommittee on Government Operations of the Committee on the District of Columbia, the subcommittee which had considered the Home Rule question, stated that the deletion of authority to the Council with respect to certain criminal statutes was to permit a law revision commission time to study and report on criminal statutes. Legislative History, *supra*, at 2117. Congress did in fact create

the District of Columbia Law Revision Commission and prohibited modification by the Council of Titles 22, 23 and 24 for two years (later extended to four years).

Those urging severability, and particularly amicus, Division VI, District of Columbia Bar, contend that, given the difference in the Senate and House bills, the most relevant legislative history is that of the Conference Committee and the floor debates in each body on the Conference Committee Report. The Conference Committee Report retained a one-house veto over certain criminal matters as well as the two year moratorium on amendments to certain criminal law provisions. No explanation is contained in the Report for the inclusion of the one-house veto.

When the Conference Report was debated in the Senate, the only reference to the one-house veto is in the remarks of Senator Eagleton where he summarized the differential methods of disapproval of charter amendments, non-criminal statutes, and criminal statutes. Legislative History, *supra,* at 3114. His emphasis however was upon the plenary authority granted to the local government. Legislative History, *supra,* at 3113–15. Senator Mathias emphasized the purposes of the bill and general congressional oversight. Legislative History, *supra,* at 3115. His emphasis was upon the constitutional authority of Congress under art. I and the budget control retained by Congress. Legislative History, *supra,* at 3116–17. Those urging severability assert that it was this law revision provision which was the "keystone" of any compromise as to criminal law. They say that this is further demonstrated by the legislative history of the District of Columbia Law Revision Act, D.C.Code §§ 49–401 to –405 (1981). *Amicus,* Division VI of the District of Columbia Bar says:

> The connection between the establishment of the Law Revision Commission and the granting of criminal code authority to the District is made clear by the legislative history of the Law Revision Commission Act, which was considered

by the same Committee and same Congress that enacted the Self-Government Act.

Identical paragraphs in the reports on the Law Revision Commission Act by the Senate and House committee on the District of Columbia give a detailed explanation of the Conference compromise on the Self-Government Act:

> Under the Home Rule Act (Public Law 93–198, approved December 24, 1973), the District Council will receive jurisdiction over the Criminal Code twenty-four months after it takes office in January, 1975.
>
> In the course of Congressional consideration of this legislation, one of the most difficult questions was the issue of granting authority over the criminal sections of the District of Columbia Code. Drafters of the self-government legislation ultimately settled on an arrangement calling for the District of Columbia Council to acquire authority over the criminal sections of the District of Columbia Code two years after taking office in January, 1975. During the interim, it was understood, a Law Revision Commission would be created by the Congress, which would have as one of its responsibilities reviewing and recommending reforms of the Codes criminal sections.

S.Rep. No. 93–1076, 93d Cong., 2d Sess. 2 (1974); H.R.Rep. No. 93–924, 93d Cong., 2d Sess. 2 (1974). Similar statements about the basis for the Conference compromise in the Self-Government Act were made on the floor of the House. See 120 Cong.Rec. 7974 (1974) (remarks of Cong. Diggs). The bill was passed by the Senate without debate. See 120 Cong.Rec. 27423 (1974).

Brief of Amicus, Division VI, D.C.Bar at 13.

With respect to the House consideration of the Conference Committee Report, the proponents of severability point us particularly to two "Dear Colleague Letters" from Rep. Diggs, one dated December 10, 1973,

and one dated December 11, 1973. In the first letter, Rep. Diggs says the House view prevailed on almost every instance in Conference. He sets forth twelve objectives that the Conference Report accomplishes, the first of which was: "Reserves the right of Congress to legislate at any time on any subject...." Legislative History, *supra*, at 3041. No mention is made of a legislative veto.

The second letter reads as follows:

U.S. House of Representatives, Committee on the District of Columbia, Washington, D.C., December 11, 1973

Dear Colleague: The Conference Report on the District of Columbia Home Rule Bill, S. 1435, is scheduled for action on the House Floor this week. Faithful to my responsibility, I have been a strong advocate of the House passed provisions and prevailed in almost every instance. There is one particular provision which was included in the House passed bill which was modified by the Conference. I wish to discuss that particular provision and why the Conference Report varies from the House passed bill.

The House passed bill prohibited the Council from making any changes in Titles 22, 23 and 24 of the D.C.Code. It was felt that since the District criminal code has not been substantially reviewed and revised for more than seventy years, this provision would hamper constructive revision of the criminal code. Since the District Committee is expected to act in the very near future on H.R. 7412, a bill which I introduced to create a law revision commission for the District, the Conference compromise was adopted. The law revision commission will be given a mandate to turn initially to revision of the D.C.Criminal Code and report its recommendations to the Congress. The Congress will then have a chance to make the much needed revision of the criminal code. This should take no longer than two years. Subsequent to that action, it seems appropriate and consistent with the concept of self-determina-

tion, that the Council be given the authority to make whatever subsequent modifications in the criminal code as are deemed necessary.

Therefore, under the Conference Report, the Council is prohibited from making changes in the criminal code for two years after it takes office. Subsequent to that, the Council may make changes subject to a veto by either House of Congress within 30 days after the transmittal of the act. Additionally, any Member may bring such disapproving resolutions.

I feel that this procedure sets the best combination for protecting the Federal interest while keeping the local Council involved in the process of making the laws which will govern.

Sincerely,

Charles C. Diggs, Jr.
Chairman, Committee on the
District of Columbia

Legislative History, *supra*, at 3041–42.

Finally, the District of Columbia argues that the action of the 98th Congress in October 1984, in adding a severability clause, Pub.L. No. 98–473, signed by the President on Oct. 12, 1984,

at a time when the issue of severability has been raised prominently in litigation both in the District of Columbia Courts and the United States District Court for the District of Columbia, is significant when it come[s] to the issue of construing the original Self-Government Act. This is so because the amendment declares the intent of the earlier law to be severable, particularly on the specific controversy at issue in these cases. *F.H.A. v. The Darlington, Inc.*, 358 U.S. 84, 90, 79 S.Ct. 141, 145, 3 L.Ed.2d 132 (1958); *Glidden Company v. Zdanok*, 370 U.S. 530, 541, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1961); *May Dept. Stores Co. v. Smith*, 572 F.2d 1275, 1277, 1278 (8th Cir.1978). *Cf.* also *United States v. Tapert*, 625 F.2d 111, 120–21 (6th Cir. 1980) (An amendment to existing law does not support an inference that the

prior meaning of the statute was inconsistent with the amendment.)

Supplemental Memorandum of Intervenor, District of Columbia, at 2.

We note that in the legislative history of the Senate action on Pub.L. No. 98–473, Senator Mathias stated:

> [T]he amendment will add a severability clause to the Home Rule Act. The Governmental Affairs Committee does not intend to infer anything concerning the intent of Congress which enacted the Home Rule Act concerning severability. However, since the court in Chadha indicated that the existence of a severability clause would be one yardstick by which it would measure whether Congress would have enacted legislation absent defective provisions, the Governmental Affairs Committee believes its inclusion in the act is beneficial for future purposes.

No similar statement was made during House consideration on this enactment. Indeed, Rep. Conte of Massachusetts, in reporting the Conference Committee's action on what became Pub.L. No. 98–473, said:

> Third, the conference agreement includes an authorization bill to correct the deficiencies in the District Home Rule Act created by the Supreme Court's Chadha decision concerning the legislative veto.... [T]his provision is designed to remove the cloud created by the Chadha decision relative to the legislative veto.

CONG.REC. H11974 (Oct. 10, 1984).

■ In our view, while the fact that the Home Rule Act includes a one-house veto tells us that Congress deemed it to be a desirable provision, the legislative history falls far short of making "evident" that without it, the Congress would not have passed the Home Rule Act. Recognizing as we must that the determination of what Congress would have done in a "what if" situation is, in the words of the Supreme Court, an "elusive inquiry," *Chadha, supra,* 462 U.S. at 932, 103 S.Ct. at 2774, we are satisfied that the legislative history affirmatively shows that the one-house

veto was not central to the passage of the Home Rule Act. We are satisfied that while Congress was indeed concerned with its ultimate legislative authority over the District of Columbia, it did not deem a one-house veto provision central to the exercise of that authority. Likewise, while it is apparent that a number of members of both the Senate and the House had particular concerns about public safety and local authority to amend the criminal code, the legislative history leaves it far from "evident" that a majority of either the House or the Senate would have rejected the Home Rule Act if they knew the one-house veto would be declared invalid, as the minority report of the House Committee on the District of Columbia prophetically foretold.

In urging unseverability, Pee places great emphasis on the statement of Rep. Diggs concerning the Senate's sentiment on a one-house veto. *See supra,* pp. 20–21. We think that when viewed in conjunction with the Senate history of previous passage of home rule acts not containing a legislative veto, *supra* p. 21, as well as the two "Dear Colleagues" letters of Rep. Diggs, *supra,* pp. 27–30 neither of which makes reference to the legislative veto and the latter of which emphasizes the centrality of the D.C.Law Revision Commission's role in proposing to Congress a comprehensive rewriting of the criminal statutes of the District of Columbia, Pee's reliance on Rep. Diggs' statement does not withstand scrutiny.

Further, "Congress' desire to retain a veto in this area cannot be considered in isolation but must be viewed in the context of Congress'" desire to provide self-government to the residents of the District of Columbia and to rid itself of the burden of legislating upon essentially local matters. *Chadha, supra,* 462 U.S. at 934, 103 S.Ct. at 2775. In this regard, the congressional intents appear quite similar to that which the Supreme Court found with respect to private immigration bills in *Chadha. Id.*

As we review the legislative history, we are satisfied that it was the myriad of other controls, such as the plenary authority of Congress under art. I of the Constitution, control over the budget, other limitations on the authority of the Council and local government which were contained in the House Committee on the District of Columbia Substitute, *see supra* pp. 13–14, 18, and which were included in the Home Rule Act as passed by Congress, as well as the limitation with respect to modification of Titles 22, 23, and 24, of the D.C.Code pending the report to Congress by the D.C.Law Revision Commission which were viewed by Congress as the central mechanisms insuring appropriate federal oversight.

We agree with Cole and the United States that it is hard to imagine that a majority of either the Senate or the House viewed a "dubiously constitutional provision as the *sine que non* of the Act." *Supra*, at 826; Brief for appellee United States in Nos. 83–196, and 84–703 at 19–20. While it is not necessary to our conclusion in this regard, we note the action of the 98th Congress in adding a severability clause, *supra*, at 18, in the context of the views quoted from Note, *Severability of Legislative Veto Provision: A Policy Analysis*, 97 HARV.L.REV. 1182, 1196 (1984), *supra*, at 15, and repeated here:

> The courts should sever veto provisions when doing so frustrates only the subsidiary policy of congressional control. If Congress decides the statute should not survive its veto provision, Congress is free to repeal the statute.

We reject Pee's suggestion that we conclude that without the legislative veto, Congress would have rejected home rule because of "a distrust of the Democratic, liberal and largely black government that would result." Reply Brief for appellant Pee at 3.[17] Rather, we agree with the United States when it says:

Thus as one commentator has concluded after close examination of the legislative history:

> [T]he time seemed to be right for passage of home rule legislation. To argue that inability to include a legislative veto over Council actions would have scuttled the entire legislation might be overstating the perceived potency of that device. The history of use of the veto mechanism in home rule proposals, the presence of other limitations in the Act, and the political climate at the time of congressional consideration of the Act would seem to make it far from evident that Congress would have refused to delegate legislative powers to a District of Columbia legislature if told at the time it could not include the legislative veto.[18]

---

[18]  R. Ehlke, "The Legal Lanscape After *INS v. Chadha:* Some Litigation Possibilities," 1983 *CRS Review* 28, 30.

Brief for appellee United States at 20.

## VI
### *Retroactivity*

The Supreme Court in *Great Northern Ry. Co. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932), continuing with such cases as *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and concluding with such cases as *United States v. Johnson*, 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982), and *Solem v. Stumes*, 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984), discussed the issues involved in whether to apply a new ruling retroactively, prospectively or in a mix of the two. We have engaged in a similar analysis in our en banc opinion in *Mendes v. Johnson*, 389 A.2d 781 (D.C. 1978). Recognizing as we do that our ruling on the *Chadha* issue in these cases is a constitutional one, we also recognize that

---

**17.** We further hold that Pee is not entitled to relief since the plain language of D.C.Code § 1–233(c)(2) (1981), the one-house veto provision, applies only to Titles 22, 23 and 24 while he was convicted of violating D.C.Code § 33–541(a)(1) (1981).

we should honor the decisions of the Supreme Court on the issue of retroactivity versus prospectivity of constitutional holdings.

The general rule for determining retroactivity of constitutional holdings was set forth in *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), whose principles were recently reaffirmed in *Solem v. Stumes, supra.* In *Stovall,* the Court set forth the formulation as follows:

> [T]he criteria guiding resolution of the [retroactivity] question implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards.

*Id.* at 297, 87 S.Ct. at 1970.

And as the court said in *Stumes,* "[c]omplete retroactive effect is most appropriate where a new constitutional principle is designed to enhance the accuracy of criminal trials." *Id.* 104 S.Ct. at 1342. The Court recognized that the question of enhancing the "accuracy of criminal trials" is a matter of degree and probabilities. *Id.* And "[s]uch probabilities must in turn be weighed against the prior justified reliance upon the old standard and the impact of retroactivity upon the administration of justice." *Stovall, supra,* 388 U.S. at 298, 87 S.Ct. at 1970. With these principles in mind we turn to our analysis of the present cases.

The *Stovall-Stumes* test is the appropriate one to apply in the present cases.[18] It is true that *Stovall* and *Stumes* each dealt with a "new rule" implementing constitutional rights,[19] whereas *Chadha* purports to return to an abiding constitutional principle from which Congress has strayed in the last fifty-two years by enacting legislation authorizing the legislative veto. The distinction is one which directly affects the "reliance" interest as a countervailing concern to those values served by retroactive application. When a rule is "new," the reliance of law enforcement authorities upon the "old" practice carries a common sense presumption of reasonableness: unless the "new" rule had been foreshadowed, no one had reason to question the old. *See Stovall v. Denno, supra,* 388 U.S. at 299–300, 87 S.Ct. at 1971. On the other hand, one might argue that, when the disapproved practice is itself the "novel" one, the reliance interest is arguably slight, because everyone concerned should have realized that the practice was invalid.

With the legislative veto, however, the practice was by no means transparently unconstitutional. The issue has divided scholars, courts, attorneys general, and the legislative and executive branches of the federal government. *INS v. Chadha,* 462 U.S. 919, 976 & n. 12, 103 S.Ct. 2764, 2797 n. 12, 77 L.Ed.2d 317 (1983) (White, J., dissenting). Congress had employed the legislative veto for over fifty-two years, in almost 200 pieces of legislation, covering areas ranging from national defense, to hazardous waste, to self-government of the

---

**18.** By its expressed terms, *United States v. Johnson, supra,* 457 U.S. at 562, 102 S.Ct. at 2594 is limited to the Fourth Amendment context. We recognize, however, that *Shea v. Louisiana,* —— U.S. ——, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985), applied the principles of *United States v. Johnson, supra,* to direct review of Fifth Amendment claims under *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). We are satisfied that our holding in this case is not inconsistent with the teachings of *Shea* and *Johnson.*

**19.** *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), held that the constitu-

tional rule announced in *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), would apply prospectively. *Wade* and *Gilbert* announced the rule that right to counsel applies to pretrial identification proceedings. *Solem v. Stumes,* 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984), held that the rule announced in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), applied prospectively. *Edwards* held that once a suspect has invoked the right to counsel, any subsequent custodial conversation must be initiated by him. *See generally Solem v. Stumes, supra,* 104 S.Ct. at 1345–46.

District of Columbia. *See Chadha, supra,* 462 U.S. at 1003–13, 103 S.Ct. at 2811–2816. (Appendix to dissenting opinion of White, J.). A practice so pervasive was at least cloaked with a solid enough patina of constitutionality to make reliance upon its probity a reasonable course.

Moreover, even when a rule appears "new" in the sense of ordering a new practice or prohibiting an old one, it must be premised upon a right already implicitly existing within the Constitution. The circumstances in the *"Chadha"* cases before us are, then, analogous to those in *Stovall* and *Stumes* where the retrospectivity of a new constitutional rule was considered. And when the constitutional principle involved does not go to the heart of the truth-finding function, but is instead "a prophylactic rule, designed to implement pre-existing rights," the Supreme Court generally has not applied it retroactively. *Stumes, supra,* 104 S.Ct. at 1343. *Cf. Linkletter v. Walker, supra.*

Here, the "truth-determining process at trial" is not at all the issue. The elements of the sexual offenses of which their respective juries convicted appellants Gary and Cole are the same under D.C.Code § 22–2801 (1981) and the S.A.R.A. of 1981. At no time had the District of Columbia intended that rape and carnal knowledge be lawful. *Compare United States v. United States Coin & Currency,* 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971). These sentences are within the permissible range of both statutes. Against their interests in reconsideration of their sentences under the sentencing provisions of the S.A.R.A. of 1981, we must balance reliance and burden on the administration of justice. *Stovall, supra,* 388 U.S. at 298–99, 87 S.Ct. at 1970–71.

■ Reliance on the continuous effectiveness of D.C.Code § 22–2801 has been total and has been eminently reasonable. In October 1981, no one challenged the House's legislative veto of the S.A.R.A. of 1981. The United States Attorney would have been derelict in his duty if he did not prosecute rape and carnal knowledge under *some* statute; because no contest was made over the legislative veto, it was reasonable to apply § 22–2801. The District of Columbia government never gave notice to potential criminal defendants that it considered the S.A.R.A. of 1981 to be in force,[20] and that Act never formed the basis of a single prosecution. Under the Supreme Court's well-established rule of criminal law, reliance that is both reasonable and extensive points toward a holding against retroactivity for a rule, as here, that does not directly affect the truth-finding function at trial. *Stumes, supra,* 104 S.Ct. at 1345 (when decision of the Supreme Court has not been "clearly" or "distinctly" foreshadowed, the reliance interest is a compelling factor against retroactivity).

We have no way of knowing how many defendants would be entitled to resentencing if we were to give our decision either partial or total retroactiveness. We are sanguine, however, that few, if any, would receive lesser sentences. For example, in sentencing Cole, the trial judge inquired of counsel whether he could moot the *Chadha* issue by sentencing the defendant to no more than would have been authorized by the S.A.R.A. of 1981. Like Cole, Gary was sentenced to no more than would have been authorized by that Act. We are buttressed in our view that few, if any, would receive lesser sentences given the various provisions of the D.C.Code for sentence enhancement. *See, e.g.,* D.C.Code § 22–104 (1981) (enhanced sentence for second convictions), D.C.Code § 22–104(a) (1981) (en-

**20.** We note that the Act was published in the D.C.Register shortly after the Act was transmitted to Congress, but prior to the one-house veto. *See* 28 D.C.Reg. 3409 (1981). On October 23, 1981, however, the Council published notice in the D.C.Register that the S.A.R.A. of 1981 had *not* become effective as law because the United States House of Representatives had disapproved that Act "in accordance with § 602(c)(2) of the District of Columbia Self-Government and Governmental Reorganization Act." 28 D.C.Reg. 4526.

hanced sentence for third felony), and D.C. Code § 22–3202 (1981) (enhanced sentence for crimes of violence while armed).

On the other hand, having to conduct a significant number of resentence hearings would place a significant burden on the administration of justice in the Superior Court. The brief of the United States indicates that there have been approximately 94 convictions for rape and carnal knowledge alone since October 5, 1981, and that as of August 1984, approximately 34 such prosecutions were pending.

Second, to give any degree of retroactivity to our holding, thereby deciding that the S.A.R.A. of 1981 constituted the law of the District of Columbia from its putative effective date to its putative repeal by Pub.L. No. 98–473, would require us to ignore the possibility that, if Congress had known the one-house veto was invalid, the S.A.R.A. of 1981 might have been overturned in a manner consistent with the bicameralism and presentment provisions of article I.

In sum, when we consider the purpose of the constitutional rule we announce in this opinion, the elements of reliance and the effect on the administration of justice as commanded both by *Stovall v. Denno, supra,* and our en banc holding in *Mendes v. Johnson, supra,* we conclude that our decision should have prospective effect only, from the date of our decision.

## VII

### *Other Contentions*

A) *Cole*

Cole contends that he is entitled to be resentenced before another judge because, he says, the trial judge misperceived the evidence leading to his conviction. We find no merit to this contention. *See Brown v. United States,* 610 F.2d 672 (9th Cir.1980) (reviewing court will not override trial court's statement that it did not rely on prior conviction later shown to be invalid in sentencing the defendant). *Accord La-*

*wary v. United States,* 599 F.2d 218 (7th Cir.1979).

B) *Gary*

Gary asserts that the trial court committed reversible error in denying his request for an instruction on the need for corroboration as to rape and carnal knowledge. He further argues that the trial court committed reversible error in denying his request to be personally present at the bench during *voir dire* of individual jurors there.

### 1. *Corroboration*

The evidence showed that Gary raped the complainant, a 16-year-old female. Gary's request for a corroboration instruction was denied. He contends this was reversible error under *Fitzgerald v. United States,* 443 A.2d 1295 (D.C.1982) (en banc), and *Arnold v. United States,* 358 A.2d 335 (D.C.1976) (en banc).

Much of the history and the pros and cons of the court created rule regarding corroboration was laid out in the majority and dissenting opinions in *Fitzgerald, supra.* Since the reasons for this court's holding in *Arnold v. United States, supra,* where we abolished the requirement for corroboration when a mature female is involved, are equally applicable to all sex offenses, regardless of the sex or age of the victim or perpetrator, we now abolish the requirement entirely.[21]

The constitutional protections provided the defendant are adequate in a sex case and the corroboration requirement no longer serves a useful purpose. *Fitzgerald, supra,* 443 A.2d at 1308 (Newman, C.J., dissenting), and *Arnold, supra,* 358 A.2d at 343. The asserted purpose of the corroboration requirement was to support and test the credibility of the complaining witness. There is no reason to distinguish between a mature female and a mature male sex offense victim. Nor is there any logical reason to raise barriers to the jury evaluation of the credibility of a minor in a sex offense where we do not require it in other situations. Courts have too long

---

**21.** This issue is properly before us. *See Arnold, supra,* 358 A.2d at 344.

"discounted reports of sexual attacks by children." *Fitzgerald, supra,* 443 A.2d at 1308 (Newman, C.J., dissenting), quoting Peters, *Children Who Are Victims of Sexual Assault and the Psychology of Offenders,* 30 AM. J. PSYCHOTHERAPY 398 (1976).

If the trial judge believes that an additional instruction is needed because of unique circumstances, he may give one which stresses the factors to be considered. The following is an example of such an instruction:

> The nature of the crime of (crime charged) is such that the substantive evidence presented often consists of the conflicting testimonies of the defendant and the complainant. Because of this fact, you must examine the evidence presented with care and caution.
>
> In addition to proving the credibility of the witnesses, you should consider a number of relevant factors in reaching your decision. These factors may include:
>
> (1) whether there was any delay by the complainant in reporting the incident;
>
> (2) whether the complainant had a motive to falsify charges;
>
> (3) inconsistent or improbable testimony by the witnesses;
>
> (4) evidence of facts and/or inconsistencies which support the complainant's testimony.
>
> You should not consider any one of these factors as decisive, but rather your decision should be based on the evidence presented. These factors, considered as a whole, should assist you in weighing the evidence before you.

*Fitzgerald, supra,* 443 A.2d at 1309 (Newman, C.J., dissenting). We conclude "[i]t is long past the time that this court should follow the example of most of the jurisdictions in this country and totally eliminate the last vestiges of this outdated, discriminatory rule." *Id.* at 1310 (footnote omitted).[22] Corroboration in sex offenses (or where the sexual nature of the touching makes it an assault, *see, e.g., Beausoliel v. United States,* 71 U.S.App.D.C. 111, 107 F.2d 292 (1939)), is abolished prospectively from the date of this opinion. This now gives the District of Columbia an homogeneous rule with respect to corroboration in sex offenses. *See United States v. Sheppard,* 186 U.S.App.D.C. 283, 569 F.2d 114 (1977).[23]

### 2. Jury Selection

After the jury selection process began, defense counsel made a request that his client be present at the bench when prospective jurors were being questioned. The trial judge refused this request.[24]

The judge proceeded with the voir dire and questioned 20 of the 52 prospective jurors at the bench subsequent to defendant's request. Out of those 20 jurors, the judge *sua sponte* removed 5 jurors for cause. Two of the other jurors that came to the bench were there accidentally. (Juror No. 225 thought he knew one of the witnesses but after some questioning it was determined that he was mistaken since the two people were approximately 20 years apart in age. Juror No. 114 approached the bench in response to the judges question, "Did anyone think the law was unfair in this area?" No. 114 stated that he did not know what the law was and had no preconceived notions.)

**22.** We note that subsequent to our decision in *Fitzgerald,* the requirement of independent corroboration of the testimony of a child victim in prosecutions brought under Title 22 of the D.C. Code has been legislatively abolished. *See* D.C. Code § 23–114 (Supp.1985). Had S.A.R.A. taken effect, the requirement of corroboration would have been abolished for all purposes in sex offenses.

**23.** We further note that the trial court did not err in refusing to instruct on corroboration given its finding, adequately supported by the record, that the complainant was a "mature female" within the meaning of *Fitzgerald* and *Arnold.*

**24.** At the time of trial, we had already decided *Robinson v. United States,* 448 A.2d 853 (D.C. 1982).

Out of the remaining 13 jurors, 2 were seated as jurors (Nos. 60 and 90). Juror No. 60 stated at the bench that his home had been burglarized and that his wife had her purse snatched. The court then questioned Juror No. 60 on whether his experiences would prevent him from judging the case fairly based on the facts. He responded "absolutely not." Neither counsel asked the juror any questions. Juror No. 90 stated at the bench that he had previously testified in the defense of his cousin who was convicted of rape. This cousin was later convicted of second-degree murder but the juror did not participate in that trial. Juror No. 90 spoke twice in open court, once he said he had an uncle who was a lawyer, the next time he spoke to say he was in some type of protection service.

■ The trial judge erred in not granting appellant's request to be present at the bench during voir dire. The defendant has a right to be present at all stages of trial, including voir dire conducted at the bench. *Boone v. United States*, 483 A.2d 1135 (D.C.1984) (en banc), and *Robinson v. United States, supra.*

Having decided that there was error, we must look at the facts of the case to determine if the error was "harmless beyond a reasonable doubt." *Robinson, supra*, 448 A.2d at 856 (citations omitted). We have decided three cases using the "harmless beyond a reasonable doubt" analysis. In two of these, we found the error to require reversal, *Robinson v. United States, supra*, and *Boone v. United States, supra.* In one case, we found the error to be harmless beyond a reasonable doubt. *Young v. United States*, 478 A.2d 287 (D.C.1984).

We believe *Young, supra*, to be the case whose facts are most similar to the case before us. In *Young*, the court refused the defendant's request to be present at the bench. Twelve jurors were questioned at the bench and only two of those were seated on the jury panel. One of the jurors retained stated that his brother was in jail for bank robbery. She stated that this would not affect her decision. Neither counsel questioned her.

The other juror in *Young* was called to the bench after having failed to reveal his employment as a computer specialist in the police department. He was retained after assuring the judge and defense counsel that his decision would not be affected. The court in *Young* also stated that the defendant had shown no indication of prejudice and took note of the fact that the defendant had an unused peremptory strike which could have been used on one of the two jurors questioned at the bench if defendant thought there might have been some prejudice from his not being present at the bench. *Young, supra*, 478 A.2d at 290 & n. 6.

In the case before us, 20 jurors were questioned at the bench including two who were incorrectly there and made no statements that reflected on fitness or the trial. Out of the remaining 18 jurors only two deliberated on defendant's trial. One of these, Juror No. 90, spoke twice in open court giving appellant some limited opportunity to assess his demeanor.

In this case, as in *Young*, appellant still had an unused peremptory strike to use against either of these two jurors if appellant had an inkling that the jurors' presence would be prejudicial. As we have said previously:

> While we do not intend our decision to trivialize in any manner the rights protected in *Robinson*, the facts before us do not indicate that appellant's immediate presence at the bench during the brief examination of the remaining two jurors would have changed the outcome of the trial.

> Under these circumstances, we must conclude that there is no reasonable possibility that the error contributed in any way to appellant's conviction. *See Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967).

*Young, supra*, 473 A.2d at 291 (citations omitted).

We find that the trial court's error was harmless beyond a reasonable doubt.

*Affirmed.*

NEBEKER, Associate Judge, concurring:

I concur in the result the majority reaches in deciding the cases. I do not, however, join the majority's holding in Part V of the opinion, on the question of severability. It is unnecessary to decide the issue. In addition, I must express my concern that the majority, in affirming the convictions of Gary, Cole, and Pee, has subordinated the relevant facts of each case to the perceived critical—and political—issues. On the corroboration issue presented by Gary, I also concur in our holding that an instruction was not required. I do not agree with wandering beyond that issue by announcing that henceforth corroboration is unnecessary in "sex offenses" involving charges by immature complainants.

I

That the majority's focus is political is not surprising. The *Chadha* decision has reverberated through much national legislation. Its impact on limited self-government of the nation's capitol is naturally of concern in this city. In these cases, however, all counsel, the trial judges and this court have focused on the political ramifications of *Chadha* at the expense of clarity in the application of the law to the actual facts before us. The opinion deals with history (Part I); the veto limit on self-government, along with *Chadha* and its application (Parts II, III and IV); the tough question of severability (Part V); and retroactivity (Part VI). These questions are made to predominate over the facts in each case. It is not then clear how the questions "decided" determine each of the three cases. I, therefore, look at the cases themselves.

Both Gary and Cole were convicted under § 22–2801 of the pre-1981 Code. They argue that the statute was repealed by the 1981 Council action passing the Sexual As-

sault Reform Act (S.A.R.A.). But as the majority opinion makes clear, *ante* at 832 & fn. 20, the 1981 Council action never became law and could not even arguably be law now. The simple answer in these two cases is that there was no repeal, and the pre-1981 Code provisions relating to sexual offenses remain in effect despite *Chadha.* I would, therefore, affirm the convictions of Gary and Cole because S.A.R.A. was never enacted and § 22–2801 was never repealed.

The situation regarding appellant Pee is somewhat different. No "veto" was exercised over the Council enactment of D.C. Code § 33–541(a)(1) (1984 Supp.), under which Pee was convicted of possession of heroin with intent to distribute. The statute was duly promulgated. Pee argues that the statute is nevertheless invalid because the one-house veto cannot be severed from the self-government act: the whole act must, therefore, fall, and—with it—the authority of the Council to enact § 33–541(a)(1). It is thus necessary to consider *Chadha* and the prospectivity of its application to the District's self-government act.

*Chadha* applies prospectively to our law from the date of this court's ruling. D.C. Council legislation before our ruling—such as enactment and full promulgation of D.C. Code § 33–541(a)(1)—is, therefore, not infected by the constitutional infirmity we now find in the legislative veto provision of the self-government act. Because we hold *Chadha* to apply prospectively, we need not, as discussed *infra,* reach the troubling issue of severability. The approach by the majority to severability I find doubtful in light of the analysis and facts in the trial court's better reasoned opinion in *Cole. See United States v. Cole,* 112 Wash.D.L. Rpt. 1117 (D.C.Super.Ct. May 9, 1984) (Smith, J.), Appendix.

A determination regarding severability is unnecessary to this court's analysis because, in any event, appellant Pee is entitled to no relief under our prospective ruling. Any question regarding severability has been settled by Congress' October 1984

express severability provision. Pub.L.No. 98–473, § 762, 98 Stat.1975 (1984). The trial judge in *Cole,* in reaching his conclusion that the legislative veto provision of the self-government act was inseverable from the grant of legislative authority to the D.C. Council, did not have the benefit of the express severability provision when he rendered his decision. That provision became effective on October 12, 1984, and is supervening law, available to this court in reaching our decision.

An appellate court applies supervening law, that is, law that becomes effective after trial but pending appeal, so long as the supervening statute has none of the effects of an impermissible ex post facto law. *Nilson Van & Storage Co. v. Marsh,* 755 F.2d 362, 365 (4th Cir.1985); *see United States v. Henson,* 159 U.S.App.D.C. 32, 44–45, 486 F.2d 1292, 1304–05 (1973). Changes in procedure are not generally treated as ex post facto. *Henson, supra,* 159 U.S.App.D.C. at 45, 486 F.2d at 1305. The holding in *Chadha* as to bicameral action and presentment is procedural; the express severability provision is a procedural one. The only question for this court, therefore, is whether our application of supervening law in its effect runs athwart the ex post facto clause of the Constitution. U.S. Const. art. 1, § 9, cl. 3; amend. XIV. Laws that make an act criminal which, when done, was innocent, or those laws that provide a greater punishment for a criminal act than applicable when the act was committed, fall within the constitutional proscription as being ex post facto. *See, e.g., Henson, supra,* 159 U.S. App.D.C. at 45, 486 F.2d at 1305.

In effect, the express severability provision has retrospectively obliterated any constitutional shadow from the D.C. Council's authority to enact D.C.Code § 33–541(a)(1) in 1981. Under the self-government act, the D.C. Council had the authority to enact criminal laws of which Congress approved. The express severability provision leaves untouched that grant of authority.[1] In addition, Congress' October 1984 legislation alters the procedure Congress must follow, in light of *Chadha,* in disapproving such enactments. Bicameral passage and presentment to the President are now necessary for an act of Congress to strike down a D.C. Council law.[2] For a new provision to repeal an old, there must be "a positive repugnancy between the provisions of the new law and those of the old; and even then the old law is repealed by implication only, pro tanto, to the extent of the repugnancy." *Wood v. United States,* 41 U.S. (16 Pet.) 342, 362–63, 10 L.Ed. 987 (1842). The grant of authority to the D.C. Council to enact criminal laws not disapproved by Congress continues intact.

Pee and all others similarly situated were on notice that their acts were unlawful; they knew at the time they acted the penalties to which they were subject for their unlawful acts. They are in no sense prejudiced by this court's application of supervening law, that is, the self-government act as it stands amended by the express severability clause.

I would thus focus on the facts of these cases and the precise issues of law before us. By so doing, I reach the same result by a less tortuous path revealing a clearer basis for the holding in each case.

## II

One remaining issue seems to be overshadowed by the major issues. That is the corroboration question presented by Gary. He complains that the trial court erred in finding the victim to be mature thus obviating the necessity for a corroboration in-

---

1. Section 762 provides:
   If any particular provision of this [the District of Columbia Self-Government and Governmental Reorganization] Act, or the application thereof to any person or circumstance, is held invalid, the remainder of this Act and the application of such provision to other persons or circumstances shall not be affected thereby.
   Pub.L. No. 98–473, § 762, 98 Stat. 1975 (1984).

2. Pub.L. No. 98–473, § 131(d), 98 Stat. 1974 (1984).

struction. I concur that this issue is correctly decided. The finding of maturity is not erroneous and no instruction on corroboration was required. *Fitzgerald v. United States*, 443 A.2d 1295 (D.C.1982) (en banc).

The court then goes a step further to reject our en banc holding in *Fitzgerald* and adopt Judge Newman's views in his dissent in that case. How this issue—the need or not for corroborative proof and a corroboration instruction in a sex offense committed against an immature complainant—is before us is not demonstrated, and it cannot be demonstrated. Yet, we purport to decide that in "sex offenses" the rule is now changed. What a curious bit of appellate law making this is! The en banc court seems to have an opinion about an issue not presented—an opinion contrary to its en banc holding of but three years ago—and gratuitously engrafts that view on the opinion in this case because it seems to be the most handy one around. If we can do this in this case, we can decide any issue in any case. This is not the mark of judicial restraint. It is the same as issuing a "judicial bull."

What is even more unusual is that we reach so far to "decide" what seems to have been decided legislatively. The D.C. Council has enacted a provision declaring that

[f]or purposes of prosecutions brought under title 22 of the D.C.Code, independent corroboration of the testimony of a child victim is not required to warrant a conviction.

D.C.Code § 23–114 (1985 Supp.). Although that enactment does not refer to "sex offenses" as does the majority, its major impact is surely to be in such cases. We thus reach so far for a "holding" to cover those few cases where the victim is not a

"child," but corroboration is otherwise required. Examples are retarded or mentally ill victims. The vices of judicially "deciding" issues not presented are clear in this case. We blur legislative action by imprecisely attempting to make a policy judgment on a related subject. Indeed, we may have overridden a legislative judgment to confine § 23–114 to "child victims." I cannot lend my support to such judicial incursion.

## APPENDIX

### SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

Criminal Division

Criminal Case No. F 5111–82

UNITED STATES OF AMERICA

v.

SYLVESTER E. COLE

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on defendant's motion to arrest judgment following his conviction for Carnal Knowledge. Defendant's sole contention is that the statute under which he was indicted, tried and convicted, D.C. Code § 22–2801 (1981),[1] was effectively repealed prior to the initiation of proceedings against him by § 13(a) of the District of Columbia Sexual Assault Reform Act of 1981 (D.C. Act 4–69) [hereinafter referred to as Sexual Assault Act].[2]

### I.

Sylvester E. Cole was indicted on January 12, 1983 and charged with one count of Kidnaping under D.C. Code § 22–2101, two counts of Rape under D.C. Code § 22–2801, and two counts of Carnal Knowledge under

---

1. § 22–2801 reads as follows:

   Whoever has carnal knowledge of a female forcibly and against her will or whoever carnally knows and abuses a female child under 16 years of age, shall be imprisoned for any term of years or for life.

2. § 13(a) of the Sexual Reform Act reads as follows:

   Sections 808, 818, 871, 873, and 874 of an Act to Establish a Code of Law for the District of Columbia, approved March 3, 1901 (31 Stat. 1332; D.C.Code, Secs. 22–2801, –2304, –3002, –3001 & –301) are repealed.

D.C. Code § 22–2801. Trial was held before a jury and on December 12, 1983 defendant was found guilty of one count of Carnal Knowledge.

On December 19, 1983, prior to sentencing, defendant filed the present motion. On February 13, 1984, due to the nature of the issues raised, this Court granted the District of Columbia's motion to intervene and on March 16, 1984 oral arguments were held.

The validity of defendant's argument rests upon the effect to be given § 602(c)(2) of the District of Columbia Self-Government and Governmental Reorganization Act [hereinafter referred to as Home Rule Act], in light of the recent decision in *INS v. Chadha*, 462 U.S. 919 (1983).[3]

Section 602(c)(2) allows either House of Congress to pass a resolution negating any act of the District of Columbia City Council, affecting Titles 22, 23 or 24 of the District of Columbia Code, within thirty days after such act is transmitted to Congress. On September 9, 1981, the House of Representatives timely exercised this power, passing a resolution disapproving of the Sexual Reform Act. H.R. Res. 208, 97th Cong., 1st Sess. (1981). Relying on the propriety of this "veto," neither Congress, the City Council nor the United States Attorney's Office had any reason to believe that the Sexual Reform Act's repeal of § 2801 went into effect. Instead, those prosecuted for sexual offenses in the District continued to be charged under prior existing law.

On June 23, 1983, however, the Supreme Court decided *INS v. Chadha*. In that case, the Court found that efforts by Congress to retain control over delegations of legislative power, through the use of negative resolutions by one House, violate the Presentment Clauses, Art. I, § 7, cls. 2, 3,

and the bicameralism requirement, Art. I, of the Federal Constitution. The Court held that the only correct method by which Congress may disapprove of actions taken pursuant to properly delegated authority is through the enactment of legislation; to wit, the passage of a bill by a majority of both Houses of Congress followed by presentment to the President. *See* 462 U.S. at 957–58.

In the present case, it is uncontested that the provision used by the House of Representatives to strike down the Sexual Reform Act, § 602(c)(2), is exactly that type of "legislative veto" prohibited by *Chadha*. Instead, the only issues which face this Court are: 1) Whether *Chadha's* prohibition against the use of legislative vetoes applies in the unique context of legislation involving the District of Columbia?; and, 2) If *Chadha* does apply, how would that finding affect both the status of the Sexual Reform Act and the defendant's conviction?

The Court addresses each question in turn.

II.

By the express terms of the Constitution, Congress has the power to "exercise exclusive Legislation in all Cases whatsoever, over such District ... as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of Government of the United States...." Art. I, § 8, cl. 17.

At first glance, it might be tempting to argue that the word "exclusive" in the above clause serves two purposes; that it not only describes the scope of Congress' power but also the means by which such power shall be exercised. To engage in this temptation, however, is to ignore both

---

**3.** The present form of § 602(c)(2) reads, in relevant part, as follows:

In the case of any such act transmitted by the Chairman with respect to any act codified in Title 22, 23, or 24, such act shall take effect at the end of the 30-day period beginning on the day such act is transmitted by the Chairman to the Speaker of the House of Representatives and the President of the Senate only if during such 30-day period 1 House of Congress does not adopt a resolution disapproving such act. D.C.Code § 1–233 (1981).

the plain meaning and past interpretaion of cl. 17.

The wording of the clause is clear and unambiguous. It states that Congress, as opposed to any other entity, has the exclusive power to legislate in regard to District affairs. It does not say, nor make provision for, Congress to enact such legislation free and clear of those restraints carefully prescribed in the Constitution.

This position is made unequivocal by examining the placement of cl. 17 in § 8 of Art. I. Section 8 lists seventeen separate areas in which the power of Congress to act was made explicit. These include such diverse powers as the ability to regulate commerce, borrow and coin money, collect taxes and declare war. Yet, in none of these areas has it ever been seriously contended that Congress might avoid the Constitution's requirements for the passage of legislation.

In *Chadha*, the Court made it clear that these requirements not only apply to direct legislation regarding § 8 powers, but to delegations of such power as well. Faced with a challenge to the delegation of the power of Congress under the naturalization clause, Art. I, § 8, cl. 4, the Court stated: "It is not disputed that this choice to delegate authority is precisely the kind of decision that can be implemented only in accordance with the procedures set out in Art. I....; bicameral passage followed by presentment to the President." 462 U.S. at 954.

Instead, the Court posited that the Founding Fathers rarely, and then only in the most unambiguous of terms, created exceptions to the normal requirements for the passage of legislation. Indeed, the Court was able to find but "four provisions in the Constitution ... by which one House may act alone with the unreviewable force of law, not subject to the President's veto." 462 U.S. at 955. The four provisions are:

(a) The House of Representatives alone was given the power to initiate impeachments. Art. I, § 2, cl. 5;

(b) The Senate alone was given the power to conduct trials following impeachment on charges initiated by the House and to convict following trial. Art. I, § 3, cl. 6;

(c) The Senate alone was given final unreviewable power to approve or to disapprove Presidential appointments. Art. II, § 2, cl. 2;

(d) The Senate alone was given unreviewable power to ratify treaties negotiated by the President. Art. II, § 2, cl. 2. 462 U.S. at 955.

It is clear, then, that the word "exclusive," if it be not surplusage, serves a purpose other than that of granting Congress sole power over the District of Columbia. Fortunately, we need not resort to conjecture in this regard, for the history of cl. 17 clearly reveals the intention behind its existence.

Inasmuch as the new seat of the Federal government was to be created from lands ceded by States already in existence, it was necessary that jurisdiction over such area be clearly delineated. As Madison stated:

Without it not only the public authority might be insulted and its proceedings interrupted with impunity, but a dependence of the members of the general government on the State comprehending the seat of the government for protection in the exercise of their duty might bring on the national councils an imputation of awe or influence equally dishonorable to the government and dissatisfactory to the other members of the Confederacy.

The Federalist No. 43, at 272 (J. Madison) (Mentor ed. 1961). Or, as the Supreme Court more succinctly expressed the proposition: "[I]t is clear from the history of the provision that the word 'exclusive' was employed to eliminate any possibility that the legislative power of Congress over the District was to be concurrent with that of the ceding states. *See* The Federalist, No. 43; 3 Elliot's Debates (2d ed. 1876), pp. 432–433; 2 Story, Commentaries on the Constitution of the United States (4th ed. 1873),

§ 1218." *District of Columbia v. Thompson Co.*, 346 U.S. 100, 109 (1953).

This, of course, is not to say that the relationship of Congress to the District is not exceptional. Due to the unique status of the Federal capital, Congress not only continues in its role as the Federal legislature, it also assumes a rule analogous to that of a State government in regard to one of its municipalities. *See Palmore v. United States*, 411 U.S. 389, 397 (1973); *District of Columbia v. Thompson Co.*, 346 U.S. 100, 108 (1953); *O'Donoghue v. United States*, 289 U.S. 516, 539 (1933). Thus, in dealing with the District, Congress is permitted to legislate "in a manner with respect to subjects that would exceed its powers, or at least would be very unusual, in the context of national legislation enacted under other powers delegated to it under Art. I, § 8." *Palmore*, 411 U.S. at 398 (citations omitted).

It cannot be over emphasized, however, that this unique status only extends itself to the definition of the scope of Congress' power. It does not grant Congress a special license to short-circuit the Constitution simply because it is acting within the boundaries of an otherwise impermissible zone.

This view has been expressed time and again by the Supreme Court. While taking note of the special relationship of Congress in regard to the District, the Court has nevertheless been careful to assert that the Federal Constitution must always guide Congress' actions. *See Palmore*, 411 U.S. at 397 ("Congress 'may exercise within the District all legislative powers that the legislature of a State might exercise within the State; ... so long as it does not contravene any provision of the Constitution of the United States.' *Capital Traction Co. v. Hof*, 174 U.S. 1, 5 (1899)"); *Thompson*, 346 U.S. at 109 ("[T]here is no constitutional barrier to the delegation by Congress to the District of Columbia of full legislative power, subject of course to constitutional limitations to which all lawmaking is subservient. ..."); *O'Donoghue*, 289 U.S. at 541 ("The mere cession of the District of Columbia to the Federal government relinquished the authority of the States, but it did not take it out of the United States or from under the aegis of the Constitution.").

Given these expressions, this Court is constrained to rule that the holding of *Chadha* applies in the present case. As stated earlier, the Founding Fathers knew how to exclude grants of Congressional power from the normal limitations on the passage of legislation. *See* 462 U.S. at 955. Yet, they failed to do so when delineating the scope of such power in regard to the District of Columbia. Therefore, inasmuch as the Court in *Chadha* was concerned with the process and not the scope of legislation, *see* 462 U.S. at 940–41, the holding in that case necessarily must apply to all exercises of legislative power not specifically exempt from the presentment and bicameralism requirements of the Constitution.

In reaching this result, the Court has carefully considered the recent holdings by two Judges of the Superior Court in *United States v. McIntosh*, F 4892–83, memo. op. (D.C.Super.Ct. March 27, 1984) (Shuker, J.), and *United States v. Langley*, F 3666–82, memo. op. (D.C.Super.Ct. March 28, 1984) (Moultrie, C.J.), which also dealt with the applicability of the *Chadha* decision to legislation affecting the District. As demonstrated above, the holding in *Chadha* compels this Court to a contrary result.

In both *Langley* and *McIntosh*, the holding in *Chadha* was viewed as not applying to the District due to the unique nature of Congress' plenary power under Art. I, § 8, cl. 17. *See McIntosh* at 6, 8; *Langley* at 5–8. This view ignores, however, that *Chadha* also dealt with a plenary power of Congress under Art. I, § 8, that of establishing uniform rules of naturalization. Art. I, § 8, cl. 4. Yet, in taking note of this power, the Court in *Chadha*, unlike the Courts in *Langley* and *McIntosh*, did not focus on a differentiation between Congressional authority which is exercised locally as opposed to nationally, nor upon power which is plenary as opposed to that

which is qualified. Instead, the Court was concerned solely with the proper exercise of legislative authority no matter what its scope or source.

In *Chadha,* the Supreme Court expressed this proposition as follows:

> The plenary authority of Congress over aliens ... is not open to question, but what is challenged here is whether Congress has chosen a constitutionally permissible means of implementing that power. As we made clear in *Buckley v. Valeo,* 424 U.S. 1 (1976); "Congress has plenary authority in all cases in which it has substantive legislative jurisdiction, *McCulloch v. Maryland,* 4 Wheat 316 (1819), so long as the exercise of that authority does not offend some other constitutional restriction." *Id.,* at 132.

462 U.S. at 940–41.

That the Court in *Chadha,* as the above quotation illustrates, necessarily meant its holding to extend to all exercises of legislative authority is made even more clear by examining the tortured results of those attempts to create artificial exceptions to applicability. In *McIntosh,* it is stated that "Congress, in exercising its plenary powers over the District of Columbia, may eschew" the Presentment Clauses and bicameralism requirement of Art. I. *McIntosh* at 12; *See also Langley* at 5, 7. Yet, if this claim be true, then Congress, acting alone, and free of the President, would have complete authority to "legislate" on matters affect-

ing the District.[4] In effect, the President would be reduced to the role of an interested, but impotent, party. Even his signature on the Home Rule Act would be nothing more than a gratuitous adornment.[5]

Quite simply, this position is untenable.

To remove the power of the Executive from the process of enacting legislation affecting the District poses two dangers. First, while it is true that Congress is often compared to a State legislature when it deals with District affairs, it should be noted that "[t]he object of the grant of exclusive legislation over the district was ... national in the highest sense, and the city organized under the grant became the city, not of a state, not of a district, but of a nation." *O'Donoghue,* 289 U.S. at 539–40 (quoting *Grether v. Wright,* 75 F. 742, 757 (6th Cir.1896)). Given this national interest, to now claim that the President plays no part in these affairs would be to exclude from this area of legislative endeavor the one branch of government which is elected by the nation as a whole and who, as a result, best assumes a national perspective. *See* 462 U.S. at 948.

Of even greater concern, however, is that the above position would also remove that most salutary of checks upon the excesses of an untethered legislature; the Presidential veto. *See* 462 U.S. at 946–48. This result would leave the citizens of the District subject not only to a legislature they did not elect, but one totally free of any

---

4. The intervenor, the District of Columbia, has unambiguously adopted this position. *See* Response of Intervenor District of Columbia to the Constitutional Issues Raised in Cole's Motion to Arrest Judgment at 4 (D.C.Super.Ct. filed January 27, 1984). Indeed, it has gone so far as to state that "Congress may wholly exclude the President from any role with respect to the local government, in a way that could not be done with respect to national affairs." Memorandum of Points and Authorities in Support of Motion of Defendants District of Columbia, Marion S. Barry, Jr., Margurite C. Stokes, John Touchstone and Maurice Turner to Dismiss Plaintiffs' Second Amended Complaint or in the Alternative for Summary Judgment at 57, *Dimond v. District of Columbia,* Civil Action No. 83–1938 (D.C.D.C. filed December 29, 1983).

5. It is stated in *Langley* that: "It is clear that Congress, by *legislation presented to the President,* may constitutionally establish a system of local governance that does not involve the President...." *Langley* at 7 (emphasis added).

Aside from placing the Court in the position of attempting to have it both ways (the President's signature is not necessary, but if it is given, it signals approval), this position was rejected in *Chadha.* There, the Court stated: "The assent of the Executive to a bill which contains a provision contrary to the Constitution does not shield it from judicial review." 462 U.S. at 942 n. 13 (citations omitted).

restraint on its authority. While the former condition is necessitated by the special federal interest in preserving the national character of the capital, the latter condition stands barren of any rationale.

"The decision to provide the President with a limited and qualified power to nullify proposed legislation by veto was based on the profound conviction of the Framers that the powers conferred on Congress were the powers to be most carefully circumscribed." 462 U.S. at 947. It would be a strange thing indeed if these same Framers did not believe that this check on legislative authority should not apply with equal force to matters concerning the governance of the nation's capital.

Therefore, for the reasons stated above, the Court holds that § 602(c)(2) of the Home Rule Act is unconstitutional and that, as a result, the Congressional attempt to negate the Sexual Reform Act was invalid.

### III.

This finding does not end the inquiry, however, for when a limitation on a power is found to be invalid, it must be determined whether the creators of such power would have allowed the grant of authority to exist absent the restraint. *See INS v. Chadha*, 462 U.S. at 931; *Consumer Energy Council v. FERC*, 218 U.S.App.D.C. 34, 49, 673 F.2d 425, 440 (1982), *aff'd sub nom. Process Gas Consumers Group v. Consumer Energy Counsel of America*, 463 U.S. 1216 (1983). In the context of the present case, this requires a determination of whether Congress would have granted the City Council the power to alter the District's criminal code without the oversight mechanism provided by § 602(c)(2).[6]

In making this determination, this Court notes that the Home Rule Act lacks a severability clause to prevent an invalid provision, such as § 602(c)(2), from affecting the rest of the statute. However, it is also noted that there is a great deal of confusion as to whether a presumption can be drawn, one way or another, from the lack of such a clause. Regarding this confusion, the Court adopts the view set forth in *Consumer Energy:*

We think the question where the presumption lies is mostly irrelevant, and serves only to obscure the crucial inquiry whether Congress would have enacted other portions of the statute in the absence of the invalidated provision. This is fully in accord with *United States v. Jackson*, [390 U.S. 570, 585 n. 27 (1968)], in which the Supreme Court refused to place significance on the absence of a severability clause: "[W]hatever relevance such an explicit clause might have in creating a presumption of severability, ... the ultimate determination of severability will rarely turn on the presence or absence of such a clause." Rather, the question is whether Congress would have enacted the remainder of the statute without the unconstitutional provision. We do not view the imposition of any unspecified burden of persuasion on either side as beneficial to the inquiry.

218 U.S. App.D.C. at 51, 673 F.2d at 442; *see also Carter v. Carter Coal Co.*, 298 U.S. 238, 312 (1936) ("[U]nder either rule, the determination ... is reached by applying the same test—namely, What was the intent of the lawmakers?").

In any case, the legislative history of the Home Rule Act speaks clearly enough that any presumption as to the legislators' intent is unnecessary.[7] For unlike the situa-

---

**6.** This test was approved by the Supreme Court in *Chadha.* There, the Court stated:

Only recently this Court reaffirmed that the invalid portions of a statute are to be severed "'[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not.'" *Buckley v. Valeo*, 424

U.S. 1, 108 (1976), quoting *Champlin Refining Co. v. Corporation Comm'n of Oklahoma*, 286 U.S. 210, 234 (1932).
462 U.S. at 931–32.

**7.** Home Rule for the District of Columbia: Background and Legislative History of H.R. 9056, H.R. 9682 and Related Bills Culminating in the District of Columbia Self-Government

tion posed in *Chadha* and *Consumer Energy*, where the courts found that there was little debate as to the role of Congressional oversight in the passage of the challenged statutes, *see* 462 U.S. at 934; 218 U.S.App. D.C. at 51–53, 673 F.2d at 442–44, Congress in debating and amending the Home Rule Act demonstrated that it viewed the issue of federal retention of power as a vital part of any plan to delegate authority over the criminal code.

Throughout the debates on the various Home Rule bills, members of both Houses of Congress made it plain that they viewed themselves as engaged in a process of compromise involving two competing interests. On the one hand, they wished to grant to the citizens of the District all the rights of self-determination traditionally enjoyed by citizens of the United States. Balanced against this, however, was their concern over the preservation of the unique national role that the Federal capital was created to fulfill.[8]

In present times, it is perhaps easy to forget that the preservation of the latter interest was viewed as a precondition to the indulgence of the former. While it is true that "the core and primary purpose of the Home Rule Act ... was to relieve Congress of the burden of legislating upon essentially local matters," *McIntosh v. Washington*, 395 A.2d 744, 753 (D.C.1978), the delegation of such authority was explicitly made "[s]ubject to the retention by Congress of the ultimate legislative authority over the nation's capital granted by

article I, § 8 of the Constitution. ..." D.C. Code § 1–201 (1981).

This concern for the protection of the Federal government has roots as deep as the existence of the District of Columbia itself. Indeed, the impetus for the creation of a special federally controlled area in which to house the nation's capital had its origin in a concern for security:

> According to the records of the Constitutional Convention, the Founding Fathers sought the establishment of a federally controlled permanent set [sic] of government separate from the jurisdiction of any State or locality in order to protect national officials from potential harassment, coercion, or arbitrary arrest by local courts and law enforcement officials. There was, moreover, a reluctance to rely on local officials for protection from potential mob violence or attempts by groups of persons to interfere with or otherwise harass or impede the conduct of the Federal Government's constitutionally prescribed duties. This concern stemmed from an incident which occurred on June 21, 1783, involving the Continental Congress and mutinous Revolutionary Army troops not yet deactivated. On that date from 80 to 250 armed troops—accounts vary on the number—marched on and surrounded Independence Hall in Philadelphia where the Continental Congress was in session. These troops had, disobeying orders of their officers, come to Philadelphia to petition the Congress for many months of pay due them. The troops were intoxicated,

and Governmental Reorganization Act, House Comm. Print, 93 Cong., 2d Sess. (1974) [hereinafter referred to as Legislative History].

**8.** These two concerns were mentioned time and time again, often in the same sentence, by those members of the House of Representatives who spoke during the floor debate of H.R. 9682. *See* Legislative History at 2106 (statement of Rep. Diggs); *id.* at 2114 (statement of Rep. Adams); *id.* at 2120 (statement of Rep. Nelsen); *id.* at 2153 (statement of Rep. McKinney); *id.* at 2156 (statement of Rep. Broyhill); *id.* at 2167 (statement of Rep. Gude); *id.* at 2168 (statement of Rep. Fauntroy); *id.* at 2174 (statement of Rep.

O'Neill); *id.* at 2176 (statement of Rep. Mann); *id.* at 2189 (statement of Rep. Mazzoli); *id.* at 2191 (statement of Rep. Stark); *id.* at 2194 (statement of Rep. Whalen); *id.* at 2216 (statement of Rep. Cleveland); *id.* at 2218 (statement of Rep. Tiernan); *id.* at 2220 (statement of Rep. Mink). *See also id.* at 1746 (statement of Rep. Diggs).

Statements by members of the Senate, during the much shorter debate of S. 1435, reflect the same concerns. *See id.* at 2755 (statement by Sen. Eagleton); *id.* at 2758 (statement by Sen. Mathias); *id.* at 2760 (statement by Sen. Scott); *id.* at 2761–62 (statement by Sen. Beall).

leaderless, and threatening to the assembled Members of Congress who had barred the doors and shutters of the Legislative Chamber. Congress requested police or militia protection from the Pennsylvania authorities, but such protection was denied. By evening the mutinous troops retired to their barracks and the Congress voted immediately to move to Princeton where local authorities promised protection from such an incident. This example was brought to the attention of the Delegates to the Constitutional Convention in 1787 and aided in carrying the argument for the "exclusive legislation" clause of article I, section 8 establishing a seat of government under the ultimate jurisdiction of the Federal Government.

Legislative History at 2797–98 (statement by Sen. Mathias). *See also id.* at 1605; Congressional Research Service, Library of Congress, *The Constitution of the United States* at 352 (1973).

This concern for security not only continued to exist in 1973, it also specifically included the substance of the city's criminal code. As will presently be shown, at all three major stages of the Home Rule Act's development, in the House, the Senate, and at Conference, Congress required that stringent safeguards be attached to any delegation of power over this vital area.

This requirement was first made evident when the House of Representatives Committee on the District of Columbia revealed the content of its proposed bill, H.R. 9682, to the House Rules Committee for the purpose of setting the terms for the upcoming floor debate. At that time, the proposed bill divided the authority of the City Council into two spheres. Certain areas such as the organization, administration, and jurisdiction of the courts, were totally isolated from Council authority. *See* Legislative History at 1316 (§ 602(a)(4)). All other ar-

eas, including the criminal code, were subject solely to Congress' ultimate power to enact overriding legislation. Legislative History at 1315 (§ 601).[9]

In reviewing these provisions, a member of the Rules Committee, Congressman Latta of Ohio, raised several questions. The following colloquy took place:

*Mr. Latta:* One further question.

I think we ought to nail this down because I think every citizen in the District of Columbia ought to be aware of this.

What you are saying is if we pass this legislation proposed by the committee that this council and the mayor could pass legislation amending the District of Columbia Criminal Code?

*Mr. Hogan:* There is no question about it in my mind.

*Mr. Latta:* So then they could let up on some of these acts that we pass as far as the criminal [sic] is concerned?

*Mr. Hogan:* The only thing they are prevented from doing are certain specific things listed in title VI, which are very limited. But as far as the code is concerned, basically what they are limited from doing as relates to the courts is [listed in] title XI of the District of Columbia Code which has to do with reorganization.... But Title[s] XXII, XXIII and XXIV of the District of Columbia Code they could amend, repeal or supersede.

*Mr. Latta:* Will the substitue by Mr. Nelsen permit this?

*Mr. Hogan:* The Nelsen bill would leave the courts as they are.

*Mr. Latta:* I am talking about the criminal code.

*Mr. Hogan:* It would not permit them to amend the criminal code whatsoever.

I don't think the people who live in this city want to see that tampered with.

---

**9.** Amendments to the proposed Charter were placed in a special category, *see* Legislative History at 1244 (§ 303(b)), which allowed Congress to veto any proposal. *See id.* at 1320 (§ 604).

Budget matters were also specially prescribed. *See id.* at 1317 (§ 603).

*Mr. Murphy:* Would the gentleman yield?

*Mr. Latta:* Yes.

*Mr. Murphy:* If it could be amended, it could be made tougher, too, could it not?

*Mr. Hogan:* Yes.

*Mr. Murphy:* You are presupposing that the people who would be in charge of this would be making the code and sanctions more lenient than they are now?

*Mr. Latta:* There is no doubt about it.

Legislative History at 1778–79.

While Congressman Latta's comments were perhaps unfair, they evidently reflected the attitude of many of his peers. Within seven days of his comments, and just before the bill was to be taken up on the floor, the Chairman of the Committee on the District of Columbia, Congressman Diggs, issued the following "Dear Colleague" letter which stated, in part:

[T]he undersigned Members of the D.C. Committee will offer an amendment in the nature of a substitute during the Floor debate.

The Committee substitute contains six important changes which were made after numerous conversations and sessions with Members of Congress and other interested parties. These changes clarify the intent of H.R. 9682 and accommodate major reservations expressed since the bill was reported out.

They are as follows:

. . . .

6. Reservations of Congressional Authority—*Additional* limitations on Council:

. . . .

(b) [The] City Council is prohibited from making changes in Statutes Under Titles 22, 23, and 24, of the D.C. Code— the Criminal Code.

Legislative History at 2084–85.

As was made clear in subsequent debate, this removal of authority over the criminal code, and the changes proposed by the other amendments, were the product of a realistic reappraisal of what guarantees would be necessary to convince a majority of the House to vote in favor of the bill. *See* Legislative History at 2096 (statement by Rep. Fraser); *id.* at 2110 (statement by Rep. Diggs); *id.* at 2155 (statement by Rep. McKinney). Significantly, as the following comment made by a member of the District of Columbia Committee demonstrates, these guarantees concerned the preservation of the federal interest:

Every change in the bill that the Members will see in the "Dear Colleague" letter they received today from many of us on the committee, are changes that have been considered by the committee. Testimony has been heard by the committee, and the fact is that the committee did not put those into the bill, because we did not feel they were necessary, and now we feel that for the pragmatic political passage of a home rule bill they are. And I would claim to the Members that they protect our Federal interests, and the Presidential interests in this city without doubt.

Legislative History at 2155 (statement by Rep. McKinney).

These amendments evidently assuaged the concerns of those who opposed H.R. 9682 in its original form. With the criminal code now moved into that section of the bill which directly prohibited Council action, *see* Legislative History at 2318 (§ 602(a)(8)), the House of Representatives passed the measure by a vote of 343 to 74. *See id.* at 2455.

The second stage in the Home Rule Act's evolution demonstrates that the same concerns which worried House members also played on the minds of the members of the Senate. There, however, an alternative means of control was proposed. Whereas H.R. 9682 opted for the inflexible measure of total prohibition, the Senate bill, S. 1435, mixed increased delegation of authority with an elastic system of Congressional review and disapproval. The City Council was to be granted the ability to alter the criminal code, but this ability was to be limited by the power of either House of

Congress to veto such legislation within thirty days after such act had been transmitted to Congress.[10] *See* Legislative History at 2646 (§ 325(g)(2)(A)).

This difference in methods, however, should not be confused with any disparity as to motivation. As was true with the House of Representatives, the Senate wished to strike a balance between the delegation of what it viewed as cumbersome duties and the protection of the national interest in the security of the Federal capital. As the Report of the Senate Committee on the District of Columbia expressed this proposition: "It is [the] committee's view that this type of veto of Council actions will ensure to the Congress the continued ultimate control of the affairs of the District while relieving it of some of the burdens of having to pass every piece of legislation itself." Legislative History at 2726.

This congruence of intentions between the House and Senate, regarding the delegation of authority over the criminal code, was most concretely demonstrated in the third, and final, stage of the Home Rule Act's development, the Conference Committee. There, the two Houses compromised, moving the criminal code out from under the prohibitory terms of H.R. 9682 to a specifically tailored legislative veto provision modeled on that of the Senate bill. This produced the provision presently in question, § 602(c)(2). *See* Legislative History at 2984.

While it is true that this evolution of the oversight control was not openly debated in Conference, this does not mean that it went unexplained. Given that the Conference Committee adopted the Senate's mechanism of restraint, Chairman Diggs evidently felt it necessary to explain to his fellow Representatives the Senate's rationale be-

hind the use of legislative vetoes and how the adoption of such a provision to govern the Council's power over the criminal code might alter the balance between the two competing interests of self-determination and the maintenance of the Federal capital's security.[11]

The explanation as to the first matter took place in a statement by Diggs on the floor of the House:

In the give and take of this conference report ... Mr. Speaker, we note that some of the strongest feelings on the part of some of us have been set aside. For example, on congressional veto, the Senate was very strong on that and as a matter of fact I think I learned for the first time the real reason the Senate has been able to pass home rule in the past so expeditiously is because it was just felt in the other body that as long as there is a veto apparatus, as long as there is a congressional process to correct what they might consider to be a misaction on the part of a local legislative body, then they were inclined to be generous about it.

Legislative History at 3050.

As to the second matter, Diggs, in his role as Chairman of the House of Representatives Committee on the District of Columbia, let it be known that he viewed the placement of the criminal code under the terms of a legislative veto as an acceptable method of balancing the two paramount interests presented by the Home Rule Act. In a "Dear Colleague" letter explaining a provision whereby the Council's authority over criminal matters would be delayed two years, pending a revision of the criminal code, he stated in part:

[U]nder the Conference Report, the Council is prohibited from making changes in the criminal code for two

10. This same veto provision was to apply to all Council legislation not directly prohibited. Legislative History at 2643 (§ 325(d)). *See also id.* at 2645 (§ 325(f)(2)) (regarding budget matters).

11. Of course, the House of Representatives already had a sophisticated knowledge of the use

of legislative vetoes, as witnessed by the extensive use of such provisions in prior legislation, *see INS v. Chadha,* 462 U.S. at 1003 (White, J., dissenting), and in the original form of H.R. 9682, regarding charter amendments. *See supra,* n. 9.

▬▬▬▬▬▬▬▬▬ years after it takes office. Subsequent to that, the Council may make changes subject to a veto by either House of Congress within 30 days after the transmittal of the act. . . .

I feel that this procedure sets the best combination for protecting the Federal interest while keeping the local Council involved in the process of making the laws which will govern.

Legislative History at 3041–42.

At all three stages of the legislative process, then, Congress was concerned with erecting sufficient safeguards against the possible erosion of the capital's security following a delegation of authority over the criminal code. Clearly, at least in Congress' eyes, this concern was not adequately answered merely by relying on the ultimate ability of Congress to override Council actions through the passage of federal legislation. The amending of H.R. 9682 makes that point undeniable.

Instead, the Congress settled on a position somewhat less drastic than the total prohibition of delegation adopted by the House of Representatives. This position, the use of a legislative veto, allowed greater flexibility while nevertheless imposing a quickly implemented restraint as to any changes in the criminal law which might prove incompatible with the federal interest. The veto provision thus became the keystone to the delegation of authority over the criminal code; the restraint and the power becoming so inextricably intertwined that the removal of one would necessarily cause the downfall of the other.

Given this mutual interdependence, it is not enough to assert, as does the intervenor, the District of Columbia, either that Congress retains the ultimate ability to override Council actions even absent the veto provision, or that the present Congress might find such ability sufficient in and of itself.[12] The fact remains that Congress has been precluded from exercising its power to repeal Council legislation due

to its reliance on the continued viability of § 602(c)(2). To now argue that the existence of such an unused alternative disapproval mechanism might somehow serve as a rationale to justify upholding the Sexual Reform Act, an act which was deliberately and unambiguously repudiated by one House of Congress, would take an act of judicial legerdemain of which this Court is incapable.

In sum, to view the restraining mechanism of § 602(c)(2) as somehow ancillary to the delegation of authority over the criminal code would not only "mutilate the section and garble its meaning," but enlarge the scope of power of the City Council far beyond the intention of Congress. *Davis v. Wallace*, 257 U.S. 478, 484 (1922) (quoting *State ex rel. McNeal v. Dombaugh*, 20 Ohio St. 167, 174 (1870)). *See Mills v. United States*, 713 F.2d 1249, 1254–55 (7th Cir.1983); *McCorkle v. United States*, 559 F.2d 1258, 1261–62 (4th Cir.1977), *cert. denied*, 434 U.S. 1011 (1978); *Quinn v. Commissioner of Internal Revenue*, 524 F.2d 617, 626 (7th Cir.1975); *U.T. Inc. v. Brown*, 457 F.Supp. 163, 170 (W.D.N.C.1978).

Thus, for the reasons stated above, the invalidation of § 602(c)(2) also serves to invalidate the delegation of authority over the criminal code to the City Council. Hence, the City Council had no authority to enact the Sexual Reform Act and, therefore, the defendant was prosecuted under the proper statute.

## IV.

The Court would have preferred to resolve defendant's motion on alternative grounds as it is well aware of the grave implications of its holding to the governance of the District of Columbia. Unfortunately, after extensive research and deliberation, the Court feels compelled to agree with Justice White that the analysis in *Chadha* "appears to invalidate all legislative vetoes irrespective of form or sub-

---

**12.** *See* Response of Intervenor District of Columbia to the Constitutional Issues Raised in

Cole's Motion to Arrest Judgment at 7–8, 11–13 (D.C.Super.Ct. filed January 27, 1984).

ject." 462 U.S. at 974 (White, J., dissenting). Thus, unless the Supreme Court chooses to revise and limit *Chadha*, which is an unlikely prospect, the scope of today's holding was unavoidable.

Accordingly, defendant's motion to arrest judgment must be, and it hereby is, denied.

SO ORDERED.

/s/ Donald S. Smith

Judge

DATE: May 9, 1984

MACK, Associate Judge, dissenting in part and concurring in part:

We should not lightly hold a provision of an Act of Congress unconstitutional. This court is sworn to uphold the Constitution as interpreted by the Supreme Court, but if the application of that interpretation to different facts is in dispute, we should proceed cautiously. In evaluating the constitutionality of any statute, we must "begin, of course, with the presumption that the challenged statute is valid." *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 944, 103 S.Ct. 2764, 2780, 77 L.Ed.2d 317 (1983). At least nine judges of the District of Columbia Superior Court (out of the thirteen who have considered the issue) have held that *Chadha* does not invalidate the one-house veto provision in the Home Rule Act, D.C.Code § 1–233(c)(2) (1981).[1] The District of Columbia has argued vigorously that the Home Rule Act is constitutional. I am persuaded by the compelling rationale of these decisions and arguments and I therefore dissent from the majority's holding (after rather summary

treatment) that the veto provision of the Home Rule Act is unconstitutional.

I.

The majority holds that the Supreme Court's decision in *Chadha*—that a legislative veto over national legislation is infirm—applies equally to the legislative veto incorporated in the Home Rule Act by which Congress supervises local lawmaking in the District of Columbia. By so holding, the majority equates the D.C. Council and its enactments with federal agencies and federal law. The result purports to require the Congress to follow the requirements of bicameralism and presentment—which it must of course follow when it acts on a *national* level—[2] when it acts in a manner which is *purely local* in purpose and effect. I find the majority's equation foreign to the rationale of *Chadha* and the conclusion illogical in light of constitutional designs and purposes. Moreover, I believe that such an interpretation in the long run is inconsistent with, and undermines, the fundamental justification for Home Rule in the District.

In my view, any discussion of the validity of Congress' exercise of authority over the District of Columbia must start with the fact that under Clause 17 of Article I, § 8 of the Constitution, Congress operates pursuant to "two distinct classes of legislative power," *American Security & Trust Co. v. Rudolph*, 38 App.D.C. 32, 45 (1912). Under the first class, Congress may enact laws relating to the District of Columbia that protect the functioning of the national government here; these laws "govern throughout the United States." *Id.*

---

1. *See United States v. Langley*, Crim. No. F–3666–82 (Mar. 28, 1984) (Chief Judge H. Carl Moultrie I); *United States v. McIntosh*, Crim. No. F–4892–83 (Mar. 27, 1984) and *United States v. Karen Lyles*, Crim. No. M–07050–84 (July 5, 1984) (Judge Robert A. Shuker); *In re B.M.*, Juv. No. J–377–84 (May 1, 1984) and *In re G.M.*, Juv. No. J–2466–83 (May 1, 1984) (Judge William A. Gardner); *United States v. Johnson*, Crim. No. F–6622–83 (Apr. 9, 1984) (Judge Warren King), *United States v. Pee*, Crim. No. F–929–84 (June 29, 1983), *United States v. Oden*, Crim. No. F–7192–83 (June 29, 1984), and *United States v.*

*McClough*, Crim. Nos. F–7005–83, M–12059–83 (June 6, 1984) (Judge Geoffrey Alprin); *In re M.P.*, Juv. No. J–1583–84 (Judge Margaret A. Haywood); *United States v. Gatti*, Crim. No. M–16424–83 (June 13, 1984) (Judge George H. Revercomb); *United States v. Jolbert*, Crim. No. F–4508–83 (Aug. 8, 1984) (Judge Joseph M. Ryan); *In re L.J.*, Juv. No. J–1676–84 (July 17, 1984) (Judge Ricardo Urbina).

2. *See infra* note 8.

Clause 17 also conveys to Congress the power to enact laws which "are local in their nature and purpose, and expressly limited to the boundaries of the District. They are not laws of the United States...." *Id.*

When Congress passes legislation pursuant to the former power, and when it enacts laws under other clauses of Article I, § 8, it acts within a sphere in which the other branches of the federal government also play a necessary constitutional role, and therefore within the web of the separation of powers design. When Congress acts on a local scale, however, as it does when it exercises its veto power over D.C. Council enactments pursuant to the Home Rule Act's veto provision, its actions fall within a sphere in which, of the three branches of government, it *alone* plays a role. For as my colleagues correctly note, "Congress' power over the District of Columbia encompasses the *full* authority of government, and thus, necessarily, the Executive and Judicial powers as well as the Legislative." *Ante* at 820 (quoting *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 76 (1982)).

Local government in the District involves the participation of a duly elected Mayor and City Council, and in a limited and negative way, the Congress. Local enactments are passed by the Council, approved by the Mayor, and if not disapproved by Congress, become law. The President has no assigned role in this process. Since Congress is both legislator and executive authority in the District, action taken by Congress to disapprove Council acts does not invade the prerogatives of another branch of the *federal* government. The evil that the bicameralism and presentment requirements for federal legislation are designed to resist— the inexorable "hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power," *Chadha*, 462 U.S. at 951, 103 S.Ct. at 2784— does not exist in this special context. Consequently, that "single, finely wrought and exhaustively considered, [constitutionally

mandated legislation] procedure," *id.*, need not be followed in this case, because there is no occasion to "assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." *Id.*

A basic fallacy in the majority's position, therefore, is its failure to heed the instruction of the *Chadha* court that it is the *purpose* underlying the constitutional scheme to which we must look in assessing the validity of a legislative veto. *Id.* at 948, 103 S.Ct. at 2783. Indeed, the majority's mechanical application of the holding in *Chadha* to the instant cases, which arise in the context of the "special relationship of Congress to the District of Columbia," *ante* at 9, exalts form over substance, giving only a faint nod of recognition to the purpose of the constitutional requirements it embraces.

It is instructive to examine why the Court in *Chadha* struck down a legislative veto over actions of a federal officer. The legislative veto was found to be infirm, in part, because by bypassing presentment to the President, the veto circumvented the Framers' "important purpose of assuring that a *'national'* perspective is grafted on the legislative process." 462 U.S. at 948, 103 S.Ct. at 2783 (emphasis added). Participation of the executive branch in the lawmaking process via presentment was thus held to serve a *national* purpose of "protect[ing] the Executive Branch from Congress and [ ] protect[ing] the *whole people* from improvident laws." *Id.* at 951, 103 S.Ct. at 2784 (emphasis added). The Court emphasized that in the records of the Constitutional Convention there is an "unmistakable *expression of a determination* that legislation by the *national* Congress be a step-by-step, deliberate and deliberative process." *Id.* at 959, 103 S.Ct. at 2788 (emphasis added). Presentment plays no such role when Congress acts pursuant to the one-house veto of the Home Rule Act.

Similarly, the one-house veto at issue in this case over D.C.Council amendments to the District's criminal laws does not impli-

cate the separation of powers concerns inherent in the bicameralism requirement for *federal* legislation, *see* Art. I, § 1 & § 7, cl. 2. As the court in *Chadha* pointed out, the requirement of approval by both houses of Congress for national laws was written into the Constitution in order to "allay [ ] the fears of both the large and small states," 462 U.S. at 950, 103 S.Ct. at 2784. The smaller states had "feared [that] a commonality of interest among the larger states would work to their disadvantage," and the larger states "were skeptical of a legislature that could pass laws favoring a minority of the people." *Id.* Approval of legislation by both Houses decreased the possibility of such imbalance.

No similar concerns require the same protection here, where Congress acts as the *local* legislature for the District of Columbia under Clause 17, *Palmore v. United States,* 411 U.S. 389, 397–98, 93 S.Ct. 1670, 1676, 36 L.Ed.2d 342 (1973),[3] inheriting its state-type powers from the ceding states. *American Security & Trust Co. v. Rudolph, supra,* 38 App.D.C. at 45. Using these inherited powers, Congress may enact state-type laws for the District that "would exceed its powers ... in the context of national legislation." *Pal-*

more *v. United States,* 411 U.S. at 398, 93 S.Ct. at 1676. The exercise of these unique, albeit geographically limited, powers finds expression in the D.C.Code, which is the equivalent of a state code of laws. *Key v. Doyle,* 434 U.S. 59, 68 nn. 13 & 14, 98 S.Ct. 280, 285 nn. 13 & 14, 54 L.Ed.2d 238 (1977); *Palmore v. United States,* 290 A.2d 573, 578–80 (D.C.1972) (D.C.Code provisions are not laws of the United States), *aff'd,* 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973).[4]

## II.

It is only by virtue of the special, local nature of these laws that the power to enact them may be delegated in its entirety, *District of Columbia v. John R. Thompson Co.,* 346 U.S. 100, 108–10, 73 S.Ct. 1007, 1011–12, 97 L.Ed. 1480 (1953); and Congress did broadly delegate its authority to the D.C.Council in the Home Rule Act. Congress' ability to delegate broad *legislative* power to the D.C.Council both demonstrates that lawmaking under Clause 17 is different in kind from "federal" lawmaking, and in addition takes this case completely out of the *Chadha* paradigm. For in *Chadha* the court stressed

**3.** *See District of Columbia v. John R. Thompson Co.,* 346 U.S. 100, 108, 73 S.Ct. 1007, 1011, 97 L.Ed. 1480 (1953); *see also Capital Traction Co. v. Hof,* 174 U.S. 1, 5, 19 S.Ct. 580, 582, 43 L.Ed. 873 (1899) (Congress "may exercise within the District all legislative powers that the legislature of a State might within the State").

**4.** In fact, from 1790 to 1801, the District continued to be governed by the laws of the ceding states, Act of July 16, 1790, ch. 28, § 1, 1 Stat. 130; *see* 13 STATS. AT LARGE OF VIRGINIA ch. 32, at 44 (W. Hening ed. 1823); 2 LAWS OF MARYLAND ch. 45, § 2, at 327 (W. Kilty ed. 1800). In 1801 Congress reenacted those state laws previously applicable to the area ceded, Act of Feb. 27, 1801, ch. 15, § 1, 2 Stat. 103 (codified in REVISED STATUTES OF THE UNITED STATES RELATING TO THE DISTRICT OF COLUMBIA § 92 (1875)), and from 1801 to 1871 the District was "governed for the most part under the laws of Maryland and Virginia as they existed at the time of cession." Byrd, *District of Columbia "Home Rule,"* 16 Am.U.L.Rev. 254, 258 (1967). Maryland statutes were freely quoted in all compilations of laws before the first D.C.Code, of 1901, was enacted, and the 1875 edition of D.C. statutes provided that all

offenses not therein defined would continue to be "punished as provided by laws in force in the District" (*i.e.,* Maryland laws). REVISED STATUTES OF THE UNITED STATES RELATING TO THE DISTRICT OF COLUMBIA § 1146 (1875). The present D.C.Code continues in force Maryland common law, D.C. Code § 49–301 (1981), and the District's courts possess the common law powers of the ceding states' courts. *Kendall v. United States,* 37 U.S. (12 Pet.) 524, 614, 620–21, 9 L.Ed. 1181 (1838); *Pang-Tsu Mow v. Republic of China,* 91 U.S.App. D.C. 324, 327, 201 F.2d 195, 198 (1952), *cert. denied,* 345 U.S. 925, 73 S.Ct. 784, 97 L.Ed. 1356 (1953). In interpreting this common law, the District's courts use Maryland decisions, *Watkins v. Rives,* 75 U.S.App.D.C. 109, 111, 125 F.2d 33, 35 (1941), and the District's courts, in contrast to federal courts, may try offenders for common law crimes formerly defined under Maryland law. *United States v. Davis,* 71 F.Supp. 749, 750 (D.D.C.1947), *rev'd on other grounds,* 83 U.S.App.D.C. 99, 167 F.2d 228, *cert. denied,* 334 U.S. 849, 68 S.Ct. 1501, 92 L.Ed. 1772 (1948).

that the Attorney General, whose action Congress had vetoed, did not engage in lawmaking or in any way "exercise 'legislative' power." 462 U.S. at 953 n. 16, 103 S.Ct. at 2785 n. 16. Instead, he had authorized a deportable alien to remain in this country under the "certain specified circumstances" set forth by Congress in a circumscribed delegation of *administrative* authority. 462 U.S. at 954, 103 S.Ct. at 2786. Both of these attributes—a lack of lawmaking capacity, combined with a narrow delegation of authority—simultaneously characterize federal agencies, and also distinguish those agencies from the D.C.Council. According to the *Chadha* Court, Congress could not delegate lawmaking power to an administrative officer because the Constitution does not permit such a delegation; and the exercise of such power by an administrator *would* violate the Constitution's presentment and bicameralism requirements. 462 U.S. at 953 n. 16, 103 S.Ct. at 2785 n. 16. There is no doubt, however, that the D.C.Council *is* a *legislative* body, in marked contrast to the Attorney General and to federal agencies, and we have held that its actions are "no less 'legislative' because of the congressional layover required." *Convention Center Referendum Committee v. District of Columbia Board of Elections and Ethics,* 441 A.2d 889, 910 (D.C.1981) (en banc) (plurality opinion). In addition, in contrast to the circumscribed delegation of administrative authority permitted federal agencies, the D.C.Council's power is as broad as the police power of the states. *Thompson, supra; see Firemen's Insurance Co. v. Washington,* 157 U.S.App.D.C. 320, 325, 483 F.2d 1323, 1328 (1973). Unlike federal agencies, the Council's power

extends to all proper subjects of legislation, much like a state legislature; and this power is limited just as is that of the states, by Article I, section 10 of the Constitution.[5] D.C.Code § 1–204 (1981); *see Grant v. Cooke,* 7 D.C. (2 Mackay) 165, 196–97 (1871) (identical prohibition on acts of 1871 D.C. legislative assembly interpreted by court as limitation "appropriate only to States or governments similar to them"); *Firemen's Insurance Co. v. Washington, supra,* 157 U.S.App.D.C. at 325, 483 F.2d at 1328 (District "akin to a state").[6]

The majority may not recognize the conclusions that follow inexorably from its argument that Congress' exercise of a veto over D.C. Council actions is "federal legislation" and is therefore subject to presentment and bicameralism requirements. By characterizing Congress' actions under Clause 17 as "federal," enactments of the D.C. Council, which exercises Congress' local authority under Clause 17, by definition also must be "federal" in nature. If the Council thus is exercising federal legislative power, inevitably *all* of its actions, under *Chadha,* are subject to bicameralism/presentment requirements, and must therefore be approved by both Houses of Congress and signed by the President before they may go into effect. By requiring Congress in *this* case to surmount the hurdles of two-House approval and presentment to the President before a Council action may be vetoed, therefore, the majority sets the stage for the imposition of these same requirements for all *D.C. Council* actions, and thus for the imposition of cumbersome, time-consuming supervision over Council actions, defeating Congress' intention in delegating broad authority to the

5. Congress evaluates an enactment of the D.C. Council by determining whether the action violates the Constitution or a clear federal interest, or exceeds the wide delegation of authority in the Home Rule Act. *See* 127 Cong.Rec. H6741 (daily ed. Oct. 1, 1981) (statement of Rep. McKinney). Significantly, the vetoes that have issued from Congress under the present scheme have been few and far between.

6. Congress had defined the District as a state in over 200 provisions of the U.S.Code, *see* U.S. Code (Index) (District of Columbia) (1982), and it has passed legislation to define the District as a state for purposes of 42 U.S.C. § 1983 in response to the Supreme Court's decision in *District of Columbia v. Carter,* 409 U.S. 418, 432, 93 S.Ct. 602, 610, 34 L.Ed.2d 613 (1973) (District not a "state or territory" for purposes of right of action under § 1983).

Council in the Home Rule Act. Although in the short run the majority's holding may be construed as promoting Home Rule, the majority has inadvertently legitimated a theoretical framework for the analysis of local law that may well lead to drastic contrary effects.

In my view, a better framework for analysis—one that preserves the principles that permit the D.C. Council to maintain independence in local matters—is one suggested by the *Chadha* court itself. The Court held that whether bicameralism and presentment are required for certain congressional actions "depends not on the [ ] form of such actions," but "upon whether they contain matter which is properly to be regarded as legislative in its character and effect." 462 U.S. at 952, 103 S.Ct. at 2784. The Court held that an act is "legislative" —and accordingly, bicameralism and presentment must be followed—only when by its activity the Congress alters or affects the "legal rights, duties and relations" of individuals or offices. 462 U.S. at 952, 103 S.Ct. at 2784. The veto in *Chadha* unquestionably had such a "legislative" effect, since it both invalidated an act of the Attorney General (altering his right and duty to act) and in addition affected Chadha's status by rendering him deportable. Although the majority mentions this aspect of the case in a cryptic footnote, *ante* note 9, it does not demonstrate how the veto in *this* case alters the "legal rights, duties or relations" of anyone or any entity. The veto provision under the Home Rule Act scheme operates simply to preserve existing law. This is well illustrated by reference to the facts of the cases at hand. Appellants Gary and Cole were convicted under D.C. Code § 22–2801 (1981). Had Congress not vetoed the Sexual Assault Reform Act, § 22–2801 would have been repealed. Under the veto provision, however, the Reform Act could not become "law" until the layover period provided within that provision had passed.[7] Since the veto was exercised within that period, the Reform Act never became law; and therefore § 22–2801 never was repealed. Thus, no "legal rights, duties or relations" of appellants Gary or Cole were affected in any way by the veto.

The *Chadha* court also emphasized that an act is "legislative" in character only if it affects "rights, duties or relations" of an actor *"outside the Legislative Branch."* 462 U.S. at 952, 103 S.Ct. at 2784 (emphasis added). The Court explicitly noted an exception to the bicameralism and presentment requirements in actions taken by each House "to bind itself" in purely internal matters that are completely *within* the "legislative arena." 462 U.S. at 956 n. 21, 103 S.Ct. at 2787 n. 21. I would suggest that when Congress acts upon D.C. Council enactments, it affects only *itself* in its local incarnation as the D.C. Council. When the Council acts, it exercises Congress' state-like powers under Clause 17 that have been wholly delegated to it, and when Congress vetoes D.C. Council enactments it thus in effect prevents its *own* proposed legislation from going into effect.

### III.

*Chadha* aside, there are disturbing implications flowing from the majority's insistence that compliance with the bicameralism and presentment clauses is an absolute constitutional prerequisite to congressional action even when Congress creates local law. Its position may be that even though actions under Clause 17 are "statelike," they nevertheless are "federal" actions and must comply equally with federal constitutional requirements. Alternatively, the majority may be saying that the Constitution is not only the federal Constitution in the District,[8] but is also the District's "state"

---

7. "[A]lthough the Council has considerable legislative power, technically it does not enact 'laws' but only [ ] 'acts' which become 'laws' after congressional layover." *Convention Center Referendum Comm., supra,* 441 A.2d at 911.

8. Of course, when legislating *federally* for the District under provisions of Article I other than Clause 17, Congress is bound by all Article I limitations; and laws enacted by Congress under Article I that are nationwide in effect apply

Constitution, paralleling the constitutions of the 50 states. Either position disregards the fact that the Supreme Court has repeatedly held that while acting as the District's local legislature Congress is not bound by constitutional requirements applicable in the federal context. Congress may act outside the limitations of Article I, § 8 when it creates state-like laws for the District, *Gibbons v. District of Columbia,* 116 U.S. 404, 408, 6 S.Ct. 427, 429, 29 L.Ed. 680 (1866) (Congress is not bound by constitutional limitations on its federal taxing power when legislating for the District); *Employers' Liability Cases,* 207 U.S. 463, 500, 28 S.Ct. 141, 146, 52 L.Ed. 297 (1908) (Congress is not bound by commerce clause limitations when it enacts local legislation); and in light of the fact that the District remains without any representation in Congress, that body arguably acts outside the scope of Article I generally when it creates local law. *See Heald v. District of Columbia,* 259 U.S. 114, 124, 42 S.Ct. 434, 435, 66 L.Ed. 852 (1922) (upholding taxation without representation). In addition, Congress is permitted to act outside of Article III, § 1 when it creates local courts for the District without Article III tenure and salary guarantees, *Palmore v. United States, supra,* and may act beyond the scope of Article III, § 2 when it creates local courts for the District with general jurisdiction beyond the jurisdictional limitations set forth in that section. Moreover, Congress has in the past operated without regard to

separation of powers principles inherent in the Constitution by giving legislative and advisory functions even to courts established in the District under Article III, at a time when those courts were also invested with local jurisdiction, *see Federal Radio Commission v. General Electric Co.,* 281 U.S. 464, 466, 468, 50 S.Ct. 389, 390, 74 L.Ed. 969 (1930); *Postum Cereal v. California Fig Nut Co.,* 272 U.S. 693, 699–700, 47 S.Ct. 284, 285–86, 71 L.Ed. 478 (1927). Explicit in these cases is that constitutional restrictions on Congress' federal power do not apply to local legislation enacted for the District.[9]

It cannot be that the Constitution is binding on Congress equally in both its federal and local capacities, as the majority holds, yet Congress when acting in its local capacity may at will simply selectively disregard certain provisions. This anomaly is preserved here because the majority, given its first opportunity to speak to the issue, has failed to look to a more secure source of rights found within the Constitution itself. If we maintain the definition of Congress as a "state" legislature in the local context, as the successor to the Maryland state legislature, we come closer not only to protecting rights of District of Columbia residents as *state* citizens that existed prior to cession, but also to carrying out the Framers' intent in adopting Clause 17. The latter rights are much more significant and deserving of protection than are the

---

equally in the District. In this *federal* context, "the principle of uniformity [in federal legislation], established in the constitution, secures the district from oppression." *Loughborough v. Blake,* 18 U.S. (5 Wheat.) 317, 325, 5 L.Ed. 98 (1820).

**9.** For example, the non-Article III nature of our court cannot be explained if all Clause 17 legislation is "federal" in nature, or even if as the "state" legislature for the District Congress is bound to comply with all constitutional provisions, including Article III. Our local court system has exclusive jurisdiction over D.C.Code offenses. If those offenses, created under Clause 17, are to be considered "federal" offenses, and therefore as "crimes against the United States," their exclusive investiture in a non-Article III court cannot be justified. For

jurisdiction over "federal" offenses is part of the "protected core" of Article III power, *Northern Pipeline Constr. Co., supra,* 458 U.S. at 70 n. 25, 102 S.Ct. at 2871 n. 25, and the district courts of the United States—Article III courts—are given exclusive jurisdiction over such prosecutions. 18 U.S.C. § 3231. Non-Article III court jurisdiction over these offenses can be justified only if they are not equivalent to "federal" offenses. In *Palmore, supra,* the Supreme Court succeeded in explaining our jurisdiction only by resort to the principle that Congress' powers under Clause 17 are different *in kind* from all other federal powers. It is Congress' power under Clause 17 to create state-type claims or offenses that better justifies the use of non-Article III courts to hear those claims.

"rights" to presentment and bicameralism for congressional supervision of local legislation, and the two sets of "rights" are incompatible, given that maintaining the latter undermines the former. It is a mistake, therefore, to view the formalism of bicameralism and presentment as somehow protective of the interests of District of Columbia citizens, or even as neutral in that regard. Its premises—that Congress can only act in a single, federal capacity, and that the D.C.Council is a federal agency—actually undermine other more significant protections inherent in the Constitution. It is due to the fact that the distinction at an early date became blurred that the D.C. resident has become an anomaly—a "federal" citizen only, stripped of all attributes of the state citizen and subject only to "federal" protections, many of which, as the above-cited cases illustrate, Congress may disregard when legislating locally.

Although I do not write on a clean slate, I write on a clear one, with an approach that is consistent with the Framers' expressed intent. An examination of the circumstances surrounding the adoption of Clause 17 demonstrates that the Framers never contemplated that Congress would be permitted to use cession to strip away the rights accorded all *state* citizens by the Constitution, rights that "attached to [District residents] irrevocably" when the District was a part of the ceding states. *Downes v. Bidwell*, 182 U.S. 244, 260–61, 21 S.Ct. 770, 776–77, 45 L.Ed. 1088 (1901). Cession did not take the District "out of the United States or from under the aegis of the Constitution," because no party to the cession contract "had ever consented to [a] construction of the cession" that would permit such an abrogation of rights. *Id.*

As state citizens prior to cession, D.C. residents were entitled to participate in the election of the President via the electoral college under Article II, § 1. In addition, as state citizens they were accorded the right of "the People of the several States" to elect representatives to the House of Representatives, Article I § 2 cl. 1. Although it is unlikely that District citizens had agreed to forfeit either right when they yielded to cession, Congress did take both away using the theory that the majority opinion supports—that Congress' power over the District is wholly "federal" in nature, and that by cession D.C. residents accordingly became "federal" citizens exclusively, retaining none of the rights guaranteed by the Constitution to all state citizens. The record surrounding the adoption of Clause 17 shows, however, that the Framers had no intention of abrogating either right through cession. In The Federalist No. 43, Madison stated, "the inhabitants [of the new District] will find sufficient inducements of interest to become willing parties to the cession," for District residents "will have had their voice in the election of the government which is to exercise authority over them," *i.e.*, Congress. (Lodge ed. 1888, at 267–68). As one commentator has written,

> At no time during the prolonged debates was there any mention of the effect upon the franchise (whether nationally or locally) of the then residents by the cessions and the acceptance by Congress of the ceded territory.... The ceding states could have prevented the situation that now exists by reserving that the rights of their citizens should not be impaired. Such a reservation would have insured the continuation of franchise rights. However, it is reasonable to assume that the ceding states felt such a reservation was not necessary, that such political rights went with the transfer of jurisdiction.

Franchino, *The Constitutionality of Home Rule and National Representation for the District of Columbia (pt. 1)*, 46 Geo. L.J. 207, 212, 214 (1957–1958). District residents succeeded in restoring their right to vote in Presidential elections only in 1961, and then only through the medium of a constitutional amendment (Amend. 23). The right to a national voice in Congress,

which was never voluntarily relinquished, in my view should be speedily restored.[10]

In addition, as state citizens District residents were guaranteed a republican form of government by the Constitution, Article IV, § 4. Madison's language in The Federalist again indicates that the Framers did not contemplate that this basic right would be undermined through cession: Madison expressed the view that "every imaginable objection" to cession was "obviated" by virtue of the fact that "a municipal legislature for local purposes, derived from their own suffrages, will of course be allowed them." Congress, however, asserting the majority's "wholly federal" power, set aside this right in 1874 and vested responsibility for local D.C. matters in a handful of appointed commissioners.[11] The right to a representative form of government was not restored until 1973, in the Home Rule Act.

Individual rights of District residents are also better protected under the "state legislature" rubric than under the "federal" scheme followed by the majority. For example, the definition of Congress as having but a single, federal, capacity, led to the denial of equal protection guarantees to District citizens under 1954, when the Supreme Court read an equal protection component into the Fifth Amendment due process clause. *See Bolling v. Sharpe,* 347 U.S. 497, 500, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). The 100-year gap between the adoption of the Fourteenth Amendment and the application of its protections to District residents would never have been possible had the courts recognized that Congress in the local context acts as a state legislature and is subject to the same constitutional limitations on its local capacity as would otherwise have been imposed, absent cession, upon the State of Maryland. As the circuit court precisely noted in 1949:

> [T]he due process of the Fifth Amendment should include or imply for the inhabitants of the District of Columbia equal protection of the laws enacted by Congress as the local legislature of the District. It is unthinkable that Congress, enacting statutes applicable only in this jurisdiction, does not violate the due process clause of the Fifth Amendment if it denies the people of this District equal protection of the laws, just as a state legislature violates the "equal protection" clause of the Fourteenth Amendment if it does the same thing.

*Hamilton National Bank v. District of Columbia,* 85 U.S.App.D.C. 109, 115, 176 F.2d 624, 630, *cert. denied,* 338 U.S. 891, 70 S.Ct. 242, 94 L.Ed. 548 (1949).

By maintaining the dual capacity analysis of Congress' actions—an analysis disregarded by the majority—the original intent of the Framers is thus partially carried out: the District's Home Rule is made more secure, and the restoration of rights of national citizenship to District residents becomes more than a distant possibility.

---

**10.** There is nothing inherent in the Constitution that prevents District residents from electing national representatives. This is demonstrated by virtue of the fact that District residents did continue to exercise the national franchise for a period of time *after* Congress had taken "exclusive" power over the District. The original enabling Act for the District allowed the laws of Maryland and Virginia to remain operative until the time that Congress actually took up residence here. During that interim period D.C. residents exercised their right to national suffrage notwithstanding the fact that the District was already a "federal" enclave and under the "exclusive" control of Congress. Franchino, *supra* at 214. District residents voted for national officers from 1790 through the election held in November 1800. Disenfranchisement took place only after the federal government took up residence in the new capital. *Id.* at 223.

**11.** Rights of self-government have time and time again been proved to apply to all citizens; all, that is, except the people of the District of Columbia[, who] are the only American citizens who have had the right of self-government taken away from them by Congress. Comm.Print, Home Rule for the District of Columbia 1973–1974, Background and Legislative History of H.R. 9056, H.R. 9682 and Related Bills Culminating in the District of Columbia Self-Government and Governmental Reorganization Act (House Committee on the District of Columbia 1974), at 2105 (remarks of Representative Diggs).

## IV.

Identifying the rights that survived cession as the rights of state citizens, and maintaining the correlating distinction between federal and local lawmaking spheres in the District, is important not only to D.C. residents, but also to all U.S. citizens, for two reasons. First, it is only because the local power is different in character from Congress' federal power that local power may be delegated in its entirety. *District of Columbia v. John R. Thompson Co., supra.* This broad delegation, with control retained to protect federal interests by way of an easily exercised legislative veto, is in the interest of Congress and its constituents because it saves precious session hours that would otherwise be spent upon local affairs that have no bearing upon the affairs of the nation as a whole.[12] Moreover, it is only by virtue of the federal/local distinction that the local legislative authority may be prevented from enacting provisions that would intrude into Congress' federal domain. *See Stoutenburgh v. Hennick,* 129 U.S. 141, 147–48, 9 S.Ct. 256, 257, 32 L.Ed. 637 (1889) (power to affect interstate commerce may not be delegated to local authority).

Furthermore, requiring Congress to separately rationalize its treatment of District residents in two distinct spheres, federal and local, serves to prevent Congress from singling out a group of citizens arbitrarily for different, and often harsher, treatment. The cases set out in footnote 13 illustrate the result, in many different contexts, of equating the D.C. and U.S.Codes, and local and federal law: residents of the District are inevitably treated differently than residents of the fifty states. For example, District residents are denied a right of appeal to the Supreme Court from decisions of this court; District residents were for a substantial period of time denied a right of action accorded to all state citizens under 42 U.S.C. § 1983; post-conviction review of Superior Court sentences in Article III courts is sharply limited; and District residents charged with federal offenses can be treated differently than all other U.S.Code violators. Congress also makes arbitrary distinctions among D.C. residents: similarly situated individuals charged with D.C. Code offenses may be treated disparately in a variety of contexts because of the equation of local with federal law. A further consequence of equating federal and local power is that federal courts both here and in Virginia use this equation to justify the retention of some jurisdiction over cases arising under the local Code, undermining the ability of this court to preserve uniformity in the interpretation and application of our local law.[13]

---

12. Prior to Home Rule, Congress had been called upon to pass on such issues as membership requirements for local police, the regulation of kite-flying on the Mall, and the proposed addition of seats to the football stadium here. Comm.Print, *supra* note 11, at 2755 (remarks of Senator Eagleton).

13. Characterizing the District as a "federal" instrumentality, the Supreme Court refused to give District residents the same right as is accorded residents of the 50 states to bring actions against their local officials under 42 U.S.C. § 1983. *District of Columbia v. Carter,* 409 U.S. 418, 432, 93 S.Ct. 602, 610, 34 L.Ed.2d 613 (1973) (District not a "state or territory" for purposes of § 1983). For similar reasons, the Court refuses to consider D.C.Code statutes as equivalent to state statutes for purposes of appeal as of right to the Supreme Court. *Palmore v. United States,* 411 U.S. 389, 395, 93 S.Ct. 1670, 1675, 36 L.Ed.2d 342 (1973). *Palmore* has the effect of treating D.D.Code enactments as "mon-grel statutes," since the Court has also held that D.C.Code laws cannot be considered "statutes of the United States" for purposes of appeal, *Key v. Doyle,* 434 U.S. 59, 98 S.Ct. 280, 54 L.Ed.2d 238 (1977); *see id.* at 74 (White, J., dissenting). By virtue of the "federal" analogy, therefore, D.C. residents have lost a significant avenue of legal redress—an appeal right to the Supreme Court.

Moreover, the anomalous status of the District has been used to justify the near elimination of all post-conviction review of Superior Court criminal convictions in Article III courts. Because D.C.Code offenders are not considered "state" offenders, they may not seek post-conviction review in Article III courts under 28 U.S.C. § 2254 (1982). And because they are also not "federal" offenders, they may not seek review under 28 U.S.C. § 2255 (1982) unless exceptional circumstances are presented. *See Swain v. Pressley,* 430 U.S. 372, 97 S.Ct. 1224, 51 L.Ed.2d 411 (1977) (D.C.Code post-conviction review procedure, D.C.Code § 23–110, must be found to

be "inadequate or ineffective" to warrant Article III review). Thus, alone among all federal and all state offenders, D.C.Code offenders sentenced by our local courts are denied access in nearly all cases to Article III courts for the exercise of the "Privilege of the Writ of Habeas Corpus" review. *See* U.S.Const. Art. I, § 9, cl. 2.

Also, because those who commit offenses under the D.C.Code are considered to have committed "offenses against the United States," they are committed to the custody of the Attorney General, who normally houses them in a prison facility at Lorton, Virginia. Although this "federal" custody has been deemed significant enough to try D.C.Code offenders who escape in federal court, under the U.S.Code escape statute—with its different elements and penalty provisions than the parallel D.C.Code statute, *see Rivers v. United States*, 334 A.2d 179, 182 (D.C. 1975)—Attorney General custody is deemed *not* sufficient as a basis for a Lorton inmate suit against prison officials under the Federal Tort Claims Act; that avenue is cut off under the rationale that the District government has actual control over Lorton. *Cannon v. United States*, 207 U.S.App.D.C. 203, 211–12, 216–17, 645 F.2d 1128, 1136–37, 1141–42 (1981). When it comes to the applicable provisions for earning "good time" at the prison, however, Attorney General custody is again deemed sufficient to justify application of federal, rather than local D.C., good time rules to offenders sentenced by the local courts and transferred from Lorton to a mental hospital. *Dobbs v. Neverson*, 393 A.2d 147, 149 & n. 6 (D.C.1978).

Additionally, because of Attorney General custody, D.C.Code offenders may be transferred to federal prisons. Once there, because D.C.Code offenses are defined by courts as "crimes against the United States," D.C. offenders are treated as though they are federal prisoners for purposes of parole. Offenders who are transferred to federal institutions are paroled under federal parole criteria rather than under the parallel D.C. criteria (while state prisoners in federal facilities retain their state parole rights), and the application of these federal parole guidelines may result in longer prison terms for D.C. offenders in federal facilities than for identical offenders who remain at Lorton. *See Cosgrove v. Smith*, 225 U.S.App.D.C. 235, 239, 697 F.2d 1125, 1129 (1983). *See also Goode v. Markley*, 195 U.S.App.D.C. 391, 394, 603 F.2d 973, 976 (1979) (since D.C.Code offenses are "crimes against the United States," sentences under the D.C.Code and under the U.S.Code may be aggregated—even though federal and state sentences may not be combined—and a parole date may be calculated based on an aggregate sentence using federal parole criteria, notwithstanding the fact that such a formula may result in more time served), *cert. denied*, 444 U.S. 1083, 100 S.Ct. 1039, 62 L.Ed.2d 768 (1980).

The definition of D.C.Code offenses as "crimes against the United States" has led to many other anomalous results. For example, in *United States v. Greene*, 195 U.S.App.D.C. 391, 396, 489 F.2d 1145, 1150 (1973), the circuit court held that because the D.C. and U.S.Codes were both enacted by Congress, the prosecutor could charge a U.S.Code offense as the predicate felony under the D.C.Code felony murder statute, despite the fact that no state offender could be similarly charged. And in *United States v. Perez*, 488 F.2d 1057, 1058–59 (4th Cir.1974), the Fourth Circuit held that because D.C.Code criminal provisions are "offenses against the laws of the United States," the federal district court in Virginia has jurisdiction to try a Lorton inmate under the D.C.Code for assault on a Lorton correctional officer, thus undermining the ability of this court to insure uniformity in the interpretation and application of our law.

The analogy of D.C.Code offenses to federal offenses is also used to justify the continued trial of D.C.Code offenders in the federal courts in the District, notwithstanding the conferral of all local criminal jurisdiction on the Superior Court. Under D.C.Code § 11–502(3) (1982), a D.C.Code violator also charged with a federal offense may be tried in a joint indictment in federal court. Even if the federal charge is ultimately dismissed, the federal court tries these offenders using federal standards. *See United States v. Brown*, 157 U.S.App.D.C. 311, 314–15, 483 F.2d 1314, 1317–18 (1973) (applying federal bail rules to defendant charged with D.C.Code offenses tried in federal court); *United States v. Belt*, 169 U.S.App.D.C. 1, 8, 14, 514 F.2d 837, 844, 850 (1975) (holding that federal evidentiary standard for impeachment by prior conviction should apply to D.C.Code offenders tried in federal court). The result may be a difference in outcome in the trials of similarly situated D.C.Code offenders by virtue of the court selected by the federal prosecutor, since the different evidentiary standards applied have substantive effects.

The continued prosecutions of D.C.Code offenses in federal court also results in a difference in treatment for District residents who are tried for U.S.Code violations in the District's federal court than for all other U.S.Code violators. For only in the District, the prosecutor may charge a defendant with a greater federal offense in one count, and with a D.C.Code offense, instead of the parallel U.S.Code provision, in a second count, mindful of the fact that the local provision carries a greater maximum penalty than its federal counterpart. If the defendant is convicted on both counts, he may receive a total sentence longer than the maximum authorized under the federal scheme. *See, e.g., United States v. Leek*, 214 U.S.App.D.C. 227, 230, 665 F.2d 383, 386 (1981) (U.S. Attorney reached outside Federal Bank Robbery Act to "circumvent the scheme's carefully crafted hierarchy of penalties"); *United States v. Canty*, 152 U.S.App. D.C. 103, 117, 469 F.2d 114, 128 (1972) ("by

In sum, federal constitutional buffers between Congress (in its local capacity) and District citizens are best maintained, and the equality of District residents with all other state citizens is preserved, by maintaining the analogy of the local legislative authority of Congress over the District to that of a state government. Although the constitutional protections applicable to the different federal and local spheres were never forfeited by District residents, their continuing vitality and application is insured by retaining the dual federal/local analysis of Congress' actions. And this analysis undoubtedly permits Congress to exercise supervision over delegated local legislative authority by way of the Home Rule Act's legislative vetoes.

I respectfully dissent from the majority's holding that the veto provision of the Home Rule Act is unconstitutional (Part IV). If I were to join the majority in assuming that the veto provision is unconstitutional, I would agree that it is severable from the remainder of the Act. I also join in the majority's disposition of other contentions.

BELSON, Associate Judge.

I join in the court's opinion except for its discussion of corroboration of a complainant's allegations of a sexual offense. As the court's opinion acknowledges at note

---

reaching out to a catchall assault provision in the District of Columbia Code ... venturing outside the federal scheme, the prosecution was able to circumvent the scheme's carefully crafted hierarchy of penalties ... [and] to obtain a sentence longer than the maximum authorized under the highest tier of the bank robbery scheme); *see also United States v. Jones,* 174 U.S.App.D.C. 34, 49, 527 F.2d 817, 832 (1975) (Wright, J., dissenting). Alternatively, if the U.S.Code offense cannot be proved at trial, or if the defendant pleads guilty to the D.C.Code charge as part of a plea bargain, the defendant may receive a harsher punishment than defendants charged with the same offense in other federal courts who can be charged only under the U.S.Code. In either event, by virtue of the equation of D.C. offenses with "crimes against the United States," District residents are singled out for disparate, and arbitrary, consideration.

Thus, the equation of the D.C.Code with federal law, and the definition of the D.C.Council, which now amends the D.C.Code, as a federal

23, appellant's conviction can be affirmed on the basis of *Arnold v. United States,* 350 A.2d 335 (D.C.1976) (en banc). The court's pronouncement of the abolition of the requirement of corroboration in all sexual offenses is gratuitous. While that policy may well be a sound one, we need not decide the issue here. I join in Part II of Judge Nebeker's concurrence.

TERRY, Associate Judge, concurring:

I join in part I of Judge Nebeker's concurring opinion. In general, I agree with the position of the trial judge in the *Cole* case on the issue of severability. However, I also agree with Judge Nebeker that Congress has decided the issue for us by enacting, only a few days before we heard argument in these cases, an express severability provision.[1] Since our decision is governed by this new statute, I see no need to discuss the point further, except to endorse what Judge Nebeker has already said.

On the question of corroboration, I agree with the majority that the time has come to abolish the corroboration requirement entirely. Since the issue is properly before us in this case, I join in part VII(B)(1) of the majority opinion. I also join in part

instrumentality, leads to different and often harsher treatment in a variety of contexts for residents of the District than for residents of the 50 states. In addition, it often undermines the ability of the autonomous local court system here to establish and preserve uniformity in the interpretation of local law. Maintaining the distinction between federal and local spheres in the District serves as a shield against these unwarranted effects and simultaneously preserves the principle of local autonomy that is the purpose and motivating force behind home rule.

1. In Pub.L. No. 98–473, § 131(*l*), 98 Stat. 1975 (1984), Congress added a new section dealing with severability to the District of Columbia Self-Government Act, which until then had contained nothing on the issue of severability. The new provision, which became section 762 of the original Act, went into effect on October 12, 1984. It appears in the 1985 Supplement to volume 1 of the District of Columbia Code, at page 28.

VII(A), which holds that Cole's sentencing argument is totally without merit.

As for the jury selection issue raised by appellant Gary, I believe that the *Robinson* and *Boone* cases[2] were wrongly decided. I recognize, however, that they are binding precedents, and thus I concur in the majority's holding that the trial court erred, but that its error was harmless.

**2.** *Robinson v. United States,* 448 A.2d 853 (D.C. 1982), *rehearing en banc denied,* 456 A.2d 848 (1983); *Boone v. United States,* 483 A.2d 1135 (D.C.1984) (en banc).